# UNITED STATES DISTRICT COURT
## DISTRICT COURT OF MASSACHUSETTS

| | | |
|---|---|---|
| **Chidiebere Nwaubani** | ) | |
| (Plaintiff) | ) | |
| | ) | |
| | ) | **Civil Action Number** |
| v. | ) | <u>1:13-CV-12552-JLT</u> |
| | ) | |
| **Divina Grossman**, in her official capacity as | ) | |
| Chancellor, University of Massachusetts Dartmouth | ) | |
| and in her individual capacity; | ) | |
| **Henry Thomas III**, in his official capacity as | ) | |
| Chairman, University of Massachusetts Board | ) | |
| of Trustees and in his individual capacity; | ) | |
| **Robert Caret**, in his individual capacity | ) | |
| **John Farrington**, in his individual capacity | ) | |
| **Alex Fowler**, in his individual capacity | ) | |
| **Anthony Garro**, in his individual capacity | ) | |
| **James Griffith**, in his individual capacity | ) | |
| **William Hogan**, in his individual capacity | ) | |
| **Jean MacCormack**, in her individual capacity | ) | |
| **Deborah Majewski**, in her individual capacity | ) | |
| **Jeannette Riley**, in her individual capacity | ) | |
| **Carol Santos**, in her individual capacity | ) | |
| **Mark Santow**, in his individual capacity | ) | |
| (Defendants) | ) | |

-------------------------------------------------------------

# SECOND AMENDED COMPLAINT

## I. INTRODUCTION

1.      Defendant Santow relayed the institutional mind in September 2011, in his public and strident campaign against any inquiry "about due process in personnel matters concerning" Plaintiff. With this institutional mindset, Defendants, individually and in conspiracy with one another, have engaged in a policy of willfully and wantonly depriving Plaintiff of his clearly established constitutional rights, and have acted in callous disregard of and with reckless indifference to those rights.

2.      As an example: our constitutional doctrine prohibits government officials from punitive retaliation against persons who exercise their First Amendment right to sue the government. Yet, upon filing this lawsuit, Defendants responded with a hasty, heavy-handed recommendation for the termination of Plaintiff's employment. This injudicious "recommendation" and its prompt scheduling by a pliant and rubber-stamping Board of Trustees necessitated an Amended Complaint. *After all Defendants had been served with the Amended Complaint and a motion for injunctive relief*, Defendant Caret instituted a mechanism for "a pre-termination hearing" which, he said, would inform his recommendation to the Board of Trustees.

3.      The deprivation of Plaintiff's federally protected rights has included subjecting him, with single-minded ruthlessness, to systemic discriminatory harassment that is unprecedented in American higher education in its severity, pervasiveness, persistence, and objective offensiveness.

4.      Defendants have acted and continue to act against Plaintiff on the basis of a false narrative—deceitfully contrived by Defendant Hogan and embellished by Defendants Farrington and Fowler—centered on the fiction of Plaintiff's noncompliance with the collective bargaining agreement and his responsibilities as a tenured faculty.

5.      At all times relevant to this Complaint, Defendants acted under the color of state law, with unconstitutional animus, without justification, rational basis and professional judgment but with callous and reckless disregard of Plaintiff's clearly established constitutional rights, with evil intent to inflict maximum harm, including death on Plaintiff, and therefore for reasons wholly unrelated to any legitimate purpose.

## II.     NATURE OF THE ACTION

6.      Plaintiff, through and by the undersigned counsel, brings this action pursuant to 42 U.S.C. § 1983 to restore some normalcy in his personal and professional life, his sense of self and his human dignity, and to redress the ongoing, systemic, reckless and brazen deprivation of his constitutionally protected rights, his rights to substantive contractual equality under 42 U.S.C. § 1981, and his civil rights under 42 U.S.C. §§ 1985 and 1986. Plaintiff asserts additional claims under Massachusetts Civil Rights Act and common law civil conspiracy.

## III.     JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. Supplemental jurisdiction over the State and common law claims pursuant to 28 U.S.C. § 1367(a) is proper because they arise out of the same conduct as the federal claims.

8.      Plaintiff's prayer for injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure and by the general legal and equitable powers of this court.

9.      Plaintiff's prayer for declaratory judgment is authorized by 28 U.S.C. §§ 2201(a) and 2202, by Rule 57 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this court.

10.     Venue is proper in this Court pursuant to 18 U.S.C. §1965 and 28 U.S.C. § 1391(b)(1-2) because the constitutional transgressions complained of herein occurred in Massachusetts.

## IV. PARTIES

<u>Plaintiff</u>

11.     ***Chidiebere Nwaubani*** (Plaintiff) was hired by the University of Massachusetts Dartmouth (hereinafter, UMassDartmouth) in 2005 for the position of Director of African and African-American Studies (AAAS) and subsequently appointed to the History Department with tenure.

12.     Plaintiff's contract and implied contract rights as Director of African and African-American Studies, reinforced by standard academic policies and practices, are protected property and liberty rights. By virtue of his tenured faculty appointment, Plaintiff also has protected property and liberty interests in his continued and continuous employment.

13.     Plaintiff is a member of three protected classes based on his national origin (Nigerian), race (Black/African), and color (Black).

<u>Defendants</u>

14.      ***Robert Caret***, President of University of Massachusetts since 2011; sued in his individual/personal capacity only

15.     ***John Farrington***, Interim Provost, UMassDartmouth, January 3, 2012-November 2012; sued in his individual/personal capacity only

16.     ***Alex Fowler***, Interim Provost, UMassDartmouth, December 2012-June 2013; sued in his individual/personal capacity only

17.     ***Anthony Garro***, Provost, UMassDartmouth, 2006-December 2011; sued in his individual/personal capacity only

18.     **James Griffith**, President, UMassDartmouth Faculty Federation Local 1895; sued in his individual/personal capacity only

19.     **Divina Grossman**, Chancellor, UMassDartmouth since July 1, 2012; sued in her official and individual capacities. For causes of action in this Complaint, Defendant Grossman is sued in her individual/personal capacity only.

20.     **William Hogan**, Dean of the College of Arts and Sciences, UMassDartmouth, 2004-July 2012; sued in his individual/personal capacity only

21.     **Jean MacCormack**, Chancellor, UMassDartmouth, 2001-June 2012; sued in her individual/personal capacity only

22.     **Deborah Majewski**, Interim Assistant Chancellor for Equal Opportunity, Diversity & Outreach, UMassDartmouth; sued in her individual/personal capacity only

23.     **Jeannette Riley**, Interim Dean of the College of Arts and Sciences, UMassDartmouth, since July 2012; sued in her individual/personal capacity only

24.     **Carol Santos**, Assistant Vice Chancellor for Human Resources, UMassDartmouth; sued in her individual/personal capacity only

25.     **Mark Santow**, Chairperson of the History Department, UMassDartmouth since fall 2011; sued in his individual/personal capacity only

26.     **Henry Thomas III**, Chairman of University of Massachusetts Board of Trustees; sued in his official and individual capacities. For causes of action in this Complaint, Defendant Thomas III is sued in his individual/personal capacity only.

27.     At all times relevant to this Complaint, Defendants acted under the color of state law; individually and in conspiracy with one another.

## V.     FACTS COMMON TO ALL

28.     Following a national search, UMassDartmouth hired Plaintiff for the position of Director of its African and African-American Studies Program (hereinafter, AAAS) effective September 1, 2005. Because Plaintiff is a historian, he was subsequently appointed with tenure as an Associate Professor in the History Department.

29.     Plaintiff had been an Assistant Professor (August 1995-August 2002) and a tenured Associate Professor (from August 2002) in the Department of History, University of Colorado-Boulder. He had previously held faculty positions in Nigeria.

30.     As Defendant Hogan (then Dean, College of Arts and Sciences), in particular, presented it during Plaintiff's on-campus interview, the Director position immediately involved transforming AAAS into a Department offering a B.A. degree.

31.     This institution-building opportunity, and the possibility of developing a model curriculum consciously built on  multidisciplinary courses, induced Plaintiff to leave Boulder—a far more enriching and supportive work environment and a 2005-2006 residential fellowship at the Institute for Advanced Study, Princeton—and relocate to UMassDartmouth.

32.     In November 2005, Plaintiff submitted a "letter of intent," a memorandum expressing an intent to submit a formal proposal for the establishment of an academic department/major. With the approval of that proposal in March 2006, Plaintiff secured the initial approval for the transformation of AAAS into a department/major.

33.     In February 2006, Plaintiff constituted a Program Development Committee (PDC) to work with him on curriculum and program development. The committee's immediate charge was to prepare the proposal for an AAAS department for consideration at the

February 2007 meeting of the Board of Trustees and thereby ensure enrollment of students into the B.A. in African and African-American Studies degree in fall 2007.

34.     Incidentally, Defendants' commitment to developing AAAS, flaky at the best times, fizzled out by the end of spring 2006. By fall 2007, Defendants, in their various capacities (from Dean to Provost to Chancellor), had no vision, no plan, no commitment to the AAAS Program.

35.     In spite of the impossible circumstances, Plaintiff imposed relevance to the Program. He personally built the Program's first website; established its first administrative office, logo, and bulletin board; expanded the scope of the Program by, for example, involving more faculty and Departments in its curriculum and activities; established an annual Distinguished Lecture Series that featured world class scholars and a former president of Cape Verde; established working relationships with the New Bedford Historical Society and local area elementary schools.

36.     In 2005-06, student enrollment in AAAS introductory course was so dismal that Defendant Hogan persistently asked Plaintiff to cancel the course. Plaintiff persevered and achieved the turn-around in spring 2007, when student enrollment jumped dramatically to 34 students. Since then, student enrollment in the course has stabilized in the upper 40s.

37.     Under Plaintiff's leadership, AAAS mounted three courses on its own for the first time, in Spring 2007. Two of the courses were cancelled in Fall 2009 because Defendant Hogan, as Dean of Arts and Sciences, claimed that he did not have the money to pay the adjunct instructors.

38.     On the whole, in spite of the unimaginable neglect of the Program by Defendants and their incessant harassment of Plaintiff, AAAS was in a qualitatively better shape by September 2011.

39.     One measure of this transformation is that while AAAS was not mentioned as one of the constituent academic units of the College of Arts and Sciences in the collective bargaining agreement (effective July 1, 2001)[1]—which was in effect in September 2005—it has been listed as such in subsequent collective bargaining agreements.[2]

***Unconstitutional Discriminatory Annual Evaluations, 2006-2007; 2007-2008***

40.     Because Plaintiff's tenure is located in the History Department, the Department was given responsibility over his annual evaluations. In the event, Plaintiff was subjected to discriminatory evaluations in 2006-2007 and 2007-2008.

41.     Linsun Cheng, Betty Mitchell, Len Travers, and Brian Williams (who constituted the Department Faculty Evaluation Committee, DFEC) and Gerard Koot, their Chairperson, knew that Plaintiff was specifically hired for the position of Director of AAAS. Yet, they routinely ignored any and everything he did in that capacity.

42.     Plaintiff taught two AAAS courses and two History Department courses each academic year. The evaluators routinely disregarded the AAAS courses and based his evaluations entirely on the History courses.

43.     In 2006-2007, Cheng, Mitchell, Travers, and Williams awarded Plaintiff "very good" in Teaching and Advising; this was downgraded to "satisfactory" by Koot. These ratings were based on irrational fabrications such as "*Dr. Nwaubani requires students to*

---

[1] An Agreement Between the Board of Trustees of the University of Massachusetts and the American Federation of Teachers Local 1895, AFL-CIO Faculty Federation at the University of Massachusetts, Dartmouth (effective July 1, 2001), Article V.C.1.

[2] *Id*. (effective July 1, 2009), Article V.C.1; *id*. (effective July 1, 2012), Article V.C.1.

*do extensive reading from books and journals on reserve at the UMD library.*"
(Plaintiff's italics.)

44.     There were also the intentional falsehoods that constituted much of the evaluative comments. For example, the DFEC reported that Plaintiff included the syllabus for a History seminar, but Koot denied seeing the syllabus.

45.     Plaintiff was awarded "very good" in Research and Professional Activities even though he (a) organized a panel at the African Studies Association conference in San Francisco in November 2006, (b) presented a paper at the same conference, (c) gave a professional talk at Texas State University, San Marcos, (d) gave a professional talk at The Ohio State University, (e) published an article in a peer-reviewed journal, and (f) served on the editorial board of two professional journals.

46.     The "very good" rating was doubly inexcusable and unjustified because some Caucasians were awarded "excellent" in this category even though their record over their entire career was inferior to Plaintiff's accomplishments in this one year.

47.     In fall 2007, Plaintiff made countless oral complaints to Defendant Hogan concerning the discriminatory evaluation.

48.     On September 26, 2007, Plaintiff met with Koot and complained about the evaluation. On February 8, 2008, Plaintiff gave a 7-page line-by-line rebuttal, which showed that the evaluation had no rational basis and was therefore fatally flawed, to Koot and Defendant Hogan. Koot never contested this rebuttal.

49.     As with the oral complaints, Defendant Hogan did nothing in response to the written rebuttal; he never even acknowledged receipt of the rebuttal.

50.     The 2007-2008 evaluation was far more reprehensible. Cheng, Koot, Mitchell, Travers, and Williams awarded Plaintiff a "Satisfactory" rating, the worst evaluation rating, in each category (Teaching and Advisement, Scholarship and Professional Activities, and University Service) ***and*** an Overall Rating of "Not Recommended."

51.     Cheng, Koot, Mitchell, Travers, and Williams knew that the evaluation lacked any rational basis and was therefore unjustifiable. In the "University Service" category, Plaintiff did not receive any credit for his activities as a Program Director.

52.     With regard to teaching, Koot acknowledged that the syllabi of Plaintiff's History 300-level courses showed that the courses were "well designed, interesting and academically rigorous." He agreed with Cheng, Mitchell, Travers, and Williams that "student evaluations for the Fall [2007] were overall solid." Nonetheless, they gave Plaintiff a "Satisfactory" rating, the lowest possible rating, in teaching. As usual, they totally disregarded Plaintiff's AAAS courses.[3]

53.     On May 27, 2008, Plaintiff notified Cheng, Koot, Mitchell, Travers, and Defendants Hogan and Griffith that he had to withdraw from the evaluation exercise having "come to the realization that as was the case last year, the History Department has turned the evaluation exercise into an organized lynching of Chidiebere Nwaubani."

_____

[3] In December 2008, Plaintiff filed an internal complaint adjudicated by George Smith, then Assistant Chancellor for Equal Opportunity, Diversity & Outreach; and Defendant Majewski, then Equal Opportunity Specialist. On March 5, 2009, Smith informed Plaintiff that Cheng, Koot, Mitchell, Travers, and Williams had alleged that Plaintiff missed 6 weeks of classes in spring 2008, and that they had offered this, for the first time, as the rationalization of their negative rating of Plaintiff's teaching. Smith agreed that Cheng, Koot, Mitchell, Travers, and Williams needed to substantiate this allegation, by specifying the dates and weeks when Plaintiff was allegedly absent from classes.

   As Plaintiff complained to Defendant MacCormack on October 19, 2011: "To this day," Cheng, Koot, Mitchell, Travers, and Williams have "not offered and cannot offer any evidence in support of their fabrication that I missed classes in spring 2008. To be clear: I did not miss even a week of classes."

54. On the same May 27, 2008, Plaintiff went to the History Department office and removed his faculty activities file. On June 13, 2008, Koot emailed Plaintiff and asked for the file to enable him (Koot) to evaluate Plaintiff "properly." Koot copied his email to Defendant Hogan. Plaintiff neither responded to Koot's email nor returned his file to him. Yet, Koot "evaluated" Plaintiff.

55. As usual, Koot's "evaluation" report was a tissue of fabrications, distortions and falsehoods. For example, he wrote that: "Professor Nwaubani states in his FAR [faculty activities report] that he told me on April 29th that he had been hospitalized during the spring semester but that he had dragged himself to his classes." Neither Plaintiff's FAR nor any of its supporting documents contained words such as "hospitalized" or "hospital" or "dragged" or "drag."

56. As with the 2006-2007 evaluation, Defendant Hogan did not take any remedial action in response to Plaintiff's written and countless oral complaints in May-December 2008 and much of 2009 about the 2007-2008 evaluation. Similarly, Defendant Griffith did not even acknowledge receipt of the complaint Plaintiff sent to him on May 27, 2008.

***EEOC Complaint & Remedial Measures To Redress Discriminatory Evaluations***

57. In January 2009, Plaintiff filed a complaint with U.S. Equal Employment Opportunity Commission (EEOC). Consequently, the administration came up with measures to remediate the History Department's discriminatory practices against Plaintiff.

58. In February 2009, Defendant Hogan asked Plaintiff to stop teaching History Department courses. As a consequence, Plaintiff has taught only AAAS courses since Fall 2009.

59.     On May 28, 2009, Defendant Hogan notified Plaintiff that the History Department had been excised from conducting his annual evaluations and that this responsibility will thenceforth lie with an AAAS Committee reporting directly to the Dean.

60.     For its defense in the EEOC complaint, UMassDartmouth submitted a **sworn** Position Statement dated August 7, 2009 that required the Dean, College of Arts and Sciences (Defendant Hogan) to do an independent evaluation of Plaintiff's 2007-2008 activities as mandated by the collective bargaining agreement.

61.     The Position Statement clarified that: "In the event the Dean determines that Professor Nwaubani should receive a rating of "Recommended" for the 2007-2008 academic year, the Dean's evaluation will become part of Professor Nwaubani's personnel file for purposes of consideration of Professor Nwaubani for future employment/promotional opportunities."

62.     UMassDartmouth further committed itself to "create an AAAS Program Committee to perform [Plaintiff's] future annual evaluations." The Position Statement clarified that the committee will be "made up of current faculty members from the AAAS Program who have direct knowledge of [Plaintiff's] activities, and submit its report directly to the Dean of the College of Arts and Sciences, rather than to the History Department's FEC. This Program Committee will be independent of the History Department's FEC."

***Clarification of Plaintiff's Employment Status***

63.     The Position Statement included a clarification of Plaintiff's employment status in these words: "The University confirms that Chidiebere Nwaubani was hired as Director

of the African and African-American Studies Program (AAAS) as of September 1, 2005, and was appointed to the History Department with tenure."

64.     The Position Statement further explained that: "As Professor Nwaubani is tenured in the History Department, this Department has responsibility to conduct his annual evaluations. However, the bulk of Professor Nwaubani's work at the University involves his role as the Director of the African, African American Studies (AAAS) Program. The AAAS Program is independent of the History Department and includes faculty members from a variety of different academic departments."

65.     The EEOC reviewed **all** the documents related to Plaintiff's recruitment (including the job advertisement, his application letter, and letters of appointment) and concluded that the records "showed that [Plaintiff] was hired by the Respondent [UMassDartmouth] on September 1, 2005 for the position of Director of the African and American studies."

### Pledges Upon Pledges, Meetings Upon Meetings To Implement Remedial Measures Submitted To EEOC

66.     From summer 2009 to March 9, 2010, Plaintiff had countless, practically monthly, meetings with Defendant Hogan on the  implementation of the remedial measures submitted to EEOC for the purpose of remediating the discriminatory evaluations.

67.     During the period, Defendant Hogan made countless pledges—in meetings with Plaintiff (some documented by Defendant Hogan himself), and whenever both ran into each other in the hallway—to implement the remedial measures.

68.     Despite the pledges, Defendant Hogan did not do anything. He did not even do the mandatory review of the 2007-2008 evaluation which he was required to do on his

own. Similarly, Defendants MacCormack, Garro, Santos, and Majewski did not do anything to ensure implementation of those remedial measures.

### *Failure To Evaluate Plaintiff's Performance As Director*

69.     Although Plaintiff was specifically hired as Director of AAAS, Defendant Hogan (to whom he reported) chose not to evaluate Plaintiff's performance in that capacity or give him any feedback on his performance.

### *Defendant Santow Vents His Personal Animosity, Ill-will And Malice*

70.     After May 27, 2008, Plaintiff kept a safe distance from the History Department. Nonetheless, members of the Department remained intensely hostile towards Plaintiff. Thus, on March 2, 2010, Defendant Santow circulated an email to his colleagues in which he lashed out against Plaintiff. Among other things, Defendant Santow alleged that Plaintiff had "done [his] level best to evade [his] responsibilities" in the Department citing that his "son (who is 4) has attended the same number of department meetings" as Plaintiff had.

71.     Defendant Santow warned that Plaintiff's "'home' in the department will remain unchanged, unless higher authorities decide that they prefer quiet over consistency, and give in to [Plaintiff's] incessant nonsense." Defendant Santow's advice to Plaintiff was: "If you intend to abdicate your professional responsibilities to the history department, at least save yourself some measure of respect and save your rants for people who don't know any better. We do."

### *Discriminatory Refusal To Promote/Plaintiff Blocked From Applying For Promotion*

72.     Based on Plaintiff's accomplishments, he should have been a Full Professor in September 2005; but certainly in 2008 if Defendants embraced the University of Massachusetts equal opportunity policy.

73.     The primary and most potent obstacle was Defendant Hogan who was reinforced in this role from October 2010 by Defendant Garro.

74.     Defendant Hogan, who talked with Plaintiff's potential employers for employment verification/employer reference purposes, knows that between 2008 and 2011, Plaintiff interviewed with over two dozen universities/colleges, mostly ranked higher than UMassDartmouth, for a variety of jobs, all at the rank of Full Professor.[4]

75.     Defendant Hogan undertook, overtime, a consistent pattern of blocking the promotion of a non-Caucasian foreign-born faculty to the rank of Full Professor on the basis of racial or other impermissible considerations.   Defendant brought this attitude toward Plaintiff's promotion by blocking him from even applying for promotion for no legitimate reasons.

76.     Plaintiff first raised the issue of his promotion with Defendant Hogan in April 2008 and then in September and October 2009. During the September 2009 meeting, Defendant Hogan reviewed Plaintiff's records in scholarship (publications, research, and grantsmanship), impact in his field, teaching, professional service, and university service and affirmed that Plaintiff had satisfied the requirements for Full Professorship.

77.     But on each of the three occasions, Defendant Hogan offered a different excuse why Plaintiff should not even apply for promotion, and specifically asked Plaintiff to hold off from applying.

---

[4] In 2007, Plaintiff was made an unsolicited offer of Full Professorship by a Texas public university; he turned it down.

78.     On July 22, 2010, Plaintiff re-opened the issue of his promotion. Defendant Hogan responded by his email of July 26, 2010 that "it will be necessary to have a committee representing the African and African-American Studies Program make a recommendation to be considered by the HST [History] Department DFEC."

### Defendant Garro's Coercive Intervention

79.     On August 31, 2010, Defendant Garro invited Plaintiff to a meeting "to discuss [Plaintiff's] request to be considered for promotion to Full Professor and also to discuss the status of the African and African American Studies Program and [his] performance as Director of this Program."

80.     None of the items specified by Defendant Garro was addressed at the so-called meeting which took place on September 29, 2010 because Defendants Garro and Hogan were exclusively concerned with ensuring Plaintiff's "full integration with the History Department" (their phrase).

81.     All through the encounter, Defendants Garro and Hogan remained distinctively belligerent towards Plaintiff. This intense hostility was only matched by their passionate defense of the discriminatory evaluations done by Cheng, Koot, Mitchell, Travers, and Williams.

82.     The encounter with Defendants Garro and Hogan was a traumatic, harrowing, and numbing experience. Plaintiff had a blistering headache by the time he left both men that afternoon. For days thereafter, he could not sleep at all; and has had sleeping difficulties since then. The headache has also persisted since then.

83.     Beginning from that encounter until July 2012, when Defendant Hogan retired, Defendants Garro and Defendant Hogan subjected Plaintiff to increasingly harsh,

unjustified employment actions that made Plaintiff to be in reasonable, perpetual fear that his employment could be arbitrarily terminated at any moment.

***Repudiation Of Commitments Made To EEOC & Foreclosing Plaintiff's Promotion***

84.     In their joint letter of October 13, 2010, Defendants Garro and Hogan conceded that Plaintiff had sought "clarification as to two critical issues: (a) his promotion and (b) the commitment made to the EEOC regarding his future annual evaluations."

85.     Defendants Garro and Hogan, in response, asserted that "All personnel action recommendations must come through a recognized academic department. Professor Nwaubani must be evaluated by a Department Faculty Evaluation Committee and Department Chair for annual evaluations, consideration for promotion, and Periodic MultiYear Review (PMYR)."

86.     With that assertion, Defendants Garro and Hogan closed the door on Plaintiff's promotion and repudiated the commitments they made to EEOC, in a sworn Position Statement, to remediate the History Department's discriminatory practices and continuing hostility towards Plaintiff.

87.     Plaintiff has repeatedly complained, in vain, to every conceivable UMassDartmouth administrator, including Defendants MacCormack, Grossman, Caret, Henry Thomas III, and Griffith (through the Faculty Federation) about the non-implementation of the remedial measures they submitted to EEOC.

***Threat To Arbitrarily Terminate Plaintiff's Employment***

88.     In their joint letter of October 13, 2010, Defendants Garro and Hogan commanded that Plaintiff "must be a fully functioning member of a recognized academic department in order to remain at the University of Massachusetts Dartmouth, [and that Plaintiff] must

establish this status no later than December 31, 2010 in order to continue as a UMass Dartmouth employee."

89.     Defendants Garro and Hogan did not give any reason why they had to compel Plaintiff to become "a fully functioning member" of a Department. But from that point, these defendants preoccupied themselves with compelling, intimidating, and bullying Plaintiff into becoming "a fully functioning member of the History Department."

90.     From Fall 2012, Defendants Farrington and Fowler (who succeeded Defendant Garro), Riley (who succeeded Defendant Hogan), Santos and Grossman made it an institutional policy to compel and intimidate Plaintiff into becoming "a fully functioning member of the History Department."

***Defendant Hogan Sabotages Plaintiff's Transfer From History Department***

91.     Plaintiff took the threat by Defendants Garro and Hogan to arbitrarily terminate his employment at the end of 2010 <u>very, very</u> seriously. Plaintiff also worried a great deal about his job prospects if his employment was terminated; how to provide shelter and food for his family not to talk of medical care and the kids' education, and where and how to store the household property if the family became homeless, a distinct possibility without any employment.

92.     Given these considerations, Plaintiff submitted to the Garro-Hogan threat. On December 9, 2010, he informed Defendant Hogan of his decision to transfer his tenure to the Department of Sociology, Anthropology, and Crime & Justice Studies (SOC/ANT/CJS).

93.      UMassDartmouth has a procedure for the transfer of faculty from one Department to another. Rather than allow Plaintiff's transfer to proceed in line with expressly stated policy, Defendant Hogan wrote new rules exclusively for Plaintiff's purpose.

94.      As decreed by Defendant Hogan, the decision of the Department's faculty "will necessarily be similar to that involved in hiring a new faculty member or awarding tenure to an existing faculty member"—even though Plaintiff was not being hired as a new faculty or being considered for tenure.

**Confiscation Of AAAS Website: A Reckless Obstruction Of Plaintiff's Work**

95.      In September 2005, when Plaintiff assumed duties at UMassDartmouth, AAAS did not have a website. *Plaintiff—entirely on his own, with his own software, and on his own time—conceptualized and personally built the first-ever AAAS website in July 2006.*

96.      From July 2006, Plaintiff (along with Ms. Karen Monahan, secretary of the Program) regularly up-dated the website.

97.      In December 2010, Defendant Hogan seized the website, denied Plaintiff and Ms. Monahan access to it, deleted the webpages, and imposed a dated curriculum (imported from the 2004-2006 catalogue) on the Program.

98.      There is no other instance where a Dean has confiscated the website of an academic unit, denied the Director or Chairperson access to the website, erased the webpages and replaced everything with his own hodgepodge of a website.

**Oral Complaint To Defendant Hogan**

99.      At about 4:00 pm on Thursday, February 3, 2011, Plaintiff had a chance meeting with Defendant Hogan in the hallway, near the Dean's office. Defendant Hogan

apologized for his inability to convene a meeting of Plaintiff and the SOC/ANT/CJS Chairperson to discuss the transfer of Plaintiff's tenure.

100.    Plaintiff had on December 9, 2010 informed Defendant Hogan of his decision to transfer his tenure to SOC/ANT/CJS. Defendant Hogan responded with one act of bad faith after another against Plaintiff.

101.    Plaintiff therefore reminded Defendant Hogan that he knew that Plaintiff had been deprived of normal faculty life since the 2006-2007 evaluation because Defendant Hogan himself regarded Plaintiff as an interloper rather than a member of his College. Plaintiff further reminded Defendant Hogan, because he also knew, that this workplace condition was taking a heavy toll on Plaintiff's health. [5]

102.    Shortly after that encounter with Defendant Hogan, Plaintiff began having chest pain that got worse by the minute.[6] As a consequence, Plaintiff spent that night into early February 4 at the Emergency Room of Charlton Hospital, Fall River.

103.    Since then, Plaintiff has frequently experienced chest pain, in varying degrees of intensity. On August 4-5, 2011, he was hospitalized at St. Luke's Hospital, New Bedford because of the chest pain. Plaintiff was asked to take Aspirin 81 mg daily.

***Arbitrary Removal Of Plaintiff From The Director Position***

104.    On September 1, 2011, the day the 2011-2012 academic year began, Defendant Hogan abruptly removed Plaintiff from the position of Director of AAAS "effective immediately." Defendant Hogan copied his letter to Defendants MacCormack and Garro.

---

[5] Plaintiff recounted this encounter in an email he sent to Defendant Hogan on September 7, 2011 and copied to some UMassDartmouth senior administrators (Defendant Garro, George Smith, Magali Carerra, Bruce Rose, and Defendant Santos), and Faculty Federation officials (including Defendant Griffith, the president).

[6] Until February 3, 2011, Plaintiff had not experienced any chest pain. Especially because all the tests showed that his heart was in excellent condition, this problem must have been caused by the high level of stress occasioned by his hostile work environment.

105. Defendant Hogan's post hoc rationalization for removing Plaintiff from the Director position was that Plaintiff had "not provided the leadership and administrative oversight that are expected from the Director."[7]

106. On October 19, 2011, Plaintiff complained to Defendant MacCormack that Defendant Hogan had "never, in writing or orally, notified [him], warned [him], or alerted [him] that [he] was not providing "the leadership and administrative oversight that are expected from the Director."

107. Plaintiff received Hogan's letter on September 3, 2011, before his lunch: he immediately lost appetite and could not eat lunch and dinner; his blood glucose reading was 158 when he checked it at 7: 59 p.m. In addition, Plaintiff experienced muscle tension in his neck and shoulders, tightness in his chest area, and hoarseness (of voice).

108. Because of the continuing chest tightening/pain, Plaintiff had a heart catheterization on September 21, 2011. As with tests done at the New Bedford Hospital, this test showed that his heart and cardiac/coronary arteries were in excellent condition—leading to the conclusion that the chest pain was caused by UMassDartmouth-induced stress.

### *Faculty Inquiry On Deprivation Of Due Process*

109. A delegation of AAAS-associated faculty went to Defendant Hogan to ask him why he removed Plaintiff from the Director position without due process.

110. Even Defendant Santow accepted the principle that the removal of the Director of AAAS by the Dean, especially one hired following a national search, should trigger due process protection. His only qualification, communicated in his widely circulated email

---

[7] Defendant Hogan had sent the AAAS operating budget allocation for the 2012 financial year to Plaintiff on July 22, 2011.

of September 21, 2011, was that Defendant Hogan should not be pressed "about due process in personnel matters concerning [Plaintiff]" because Defendant Santow knew "with something close to perfect certainty that Bill [Hogan] won't address such questions, because he can't, for legal reasons."

### Another Case Of Different And Unequal Treatment

111.     Defendant Hogan treated Plaintiff differently and unfavorably compared with other Directors and Chairpersons. Frank Sousa, a Caucasian, served as Director of the Center for Portuguese Studies and Culture for 17 years, and resigned from the position, on his own, in September 2013.

112.     Gerard Koot, a Caucasian, was Interim Chairperson of the History Department from 1986-1988 and Chairperson of the History Department from 1990 until he retired in 2010. Koot combined chairmanship of the History Department with the position of Director, Master of Arts in Teaching Program from 1998 until he retired in 2010.

### Defendant Hogan's Deceitfully Contrived False Narrative

113.     The letter by which Defendant Hogan ousted Plaintiff from the Director position cited Plaintiff's tenured position in the History Department, and included another false statement that: "as [Defendant Hogan and Plaintiff had] discussed on numerous occasions over the last two years, [Plaintiff has] not been in compliance with the provisions of the Faculty Federation collective bargaining agreement."

114.     Although Defendant Hogan knew that his *falsification* of the said discussions was contradicted by Defendant Hogan's *own documentation*, he nonetheless warned Plaintiff to "correct this situation" [Plaintiff's alleged non-compliance with the collective

bargaining agreement], "as not doing so will put [Plaintiff's] position at the University at risk."

115.    This deceitfully contrived false narrative erased any record of the discriminatory evaluations, Plaintiff's complaint with EEOC, the remedial measures submitted to EEOC, Defendant Hogan's countless pledges in 2009-2010 to implement those remedial measures, his failure and obdurate refusal to do so, and the consistent deliberate indifference to Plaintiff's complaints.

116.    Defendant Hogan's false narrative also took special care to protect Cheng, Koot, Mitchell, Travers, and Williams (none of whom belongs to Plaintiff's protected classes) who had subjected Plaintiff to discriminatory annual evaluations as detailed above.

117.    Defendant Hogan's false narrative was subsequently adopted by other Defendants as the basis for their false, pretextual allegations against Plaintiff.

### *Disadvantageous Reassignment/Demotion*

118.    Defendant Hogan's letter by which he arbitrarily removed Plaintiff from the Director position also noted that: "As a consequence of [Plaintiff's] removal as Director [Plaintiff] will no longer be eligible for the $1,500 stipend, which Directors receive and [Plaintiff] will no longer be eligible for the one course per semester release [he] received as Director. Accordingly, [Plaintiff's] teaching load will be increased to the standard 18 units per academic year...."

119.    By the same letter, Defendant Hogan promptly and arbitrarily re-assigned Plaintiff to become a "fully functioning member of the History Department."

120.    Defendant Hogan threatened that he "must state unequivocally that [Plaintiff] must become a fully functioning member of the History Department." He warned

Plaintiff "to address the issues raised here so that [UMassDartmouth] might avoid formal disciplinary proceedings that could lead to termination for cause proceedings."

### Stigmatization Of Plaintiff

121. On September, 21, 2011, Defendant Santow wrote and disseminated a lengthy email in connection with the removal of Plaintiff from the Director position. Defendant Santow circulated his email—with knowledge that it contained false, fabricated, and derogatory information about Plaintiff's record—to 29 (excluding Defendant Santow and Plaintiff) UMassDartmouth employees.

122. Defendant Santow disclosed that he met with Defendant Hogan on September 16, 2011, that Defendant Hogan briefed him on the removal of Plaintiff from the Director position and revealed that Plaintiff had been removed because of "personnel matters" that had been "chugging along for many months."

123. Plaintiff's letter of October 19, 2011 to Defendant MacCormack complained that Defendant Santow's email "was primarily intended to disparage Chidiebere Nwaubani. Furthermore, the email itself is clear that it was based on background misinformation supplied by Dean Hogan."

### Denial Of 2011 Salary Increase With Threat of Further Disciplinary Action

124. By a letter dated October 17, 2011, Defendant Hogan denied Plaintiff "the salary rate increase [of 3% to the base salary] scheduled for June 30, 2011." Defendant Hogan's post hoc rationalization was that Plaintiff had not submitted his activities report for the 2010-2011 evaluation to the History Department.

125.    Defendant Hogan copied his letter to Defendants MacCormack, Garro, and Griffith. Defendant Santos promptly implemented Defendant Hogan's decision, and denied Plaintiff the salary increase.

***Deliberate Indifference By Defendants MacCormack, Caret, Santos & Griffith***

126.    On October 19, 2011, Plaintiff hand-delivered a 14-page letter to Defendant MacCormack complaining that his "constitutional and civil rights, including [his] tenure rights and privileges, are under **severe and expanding assault** by Provost Anthony Garro and Dean William Hogan of the College of Arts and Sciences."[8]

127.    The letter explained that because of Defendant Hogan's harassment, "for the past 12 months, [Plaintiff had] lived every day without knowing if [he] would have [his] job tomorrow, next week, or next month." Plaintiff also reported to Defendant MacCormack the resulting emotional distress he had suffered as a result and its deleterious effect on his health.

128.    Plaintiff's letter  also reported the discriminatory harassment Defendants Hogan and Garro had directed against him, including non-implementation of the remedial measures submitted to EEOC, blocking him from even applying for promotion, bullying him into "full integration" with the History Department, and sabotaging his employment opportunities elsewhere.

129.     Plaintiff pointed out that Defendant Hogan had fabricated a false narrative, centered on the fiction of Plaintiff's noncompliance with the collective bargaining

---

[8] All bold, underlined italics are in letter under reference.

agreement and his responsibilities as a tenured faculty, *to serve as the false, pretextual basis for the termination of Plaintiff's employment.*[9]

130.     Plaintiff also emphasized that Defendant Hogan had (and still has) a conscious discriminatory animus against him, and that this animus shaped all actions Defendant Hogan had taken against him.

131.     The letter was copied and also hand-delivered to Defendants Santos, Garro, and Hogan. Defendants Garro and Hogan did not rebut the charges leveled against them.

132.     The letter was mailed *twice* to Defendant Caret's office by post office express mail service, and faxed to UMassDartmouth Faculty Federation Local 1895.

133.  There was no response—not even to acknowledge receipt of the letter—from Defendants MacCormack, Caret, Griffith and the Faculty Federation.

### Defendant MacCormack: Unheeded Pleas For Sabbatical

134.     Plaintiff was hired in 2005: since then, he has been sponsored to only **one** professional conference, in fall 2006. No other faculty member hired in 2005, who is so oriented, has been sponsored to only one conference.

135.     Plaintiff qualified for sabbatical (at full salary for a semester) at the end of May 2011. Plaintiff should have applied, but could not apply, for sabbatical in October 2010 because that was precisely when Defendant Hogan, supported by Defendant Garro, escalated his discriminatory harassment of Plaintiff.

136.     Plaintiff's complaint of 10-19-2011 notified Defendants MacCormack, Caret, and Santos that Defendants Hogan and Garro were consciously blocking him from applying for sabbatical and travel grants.

---

[9] Plaintiff repeated this specific complaint to Defendants Grossman and Thomas III in January 2013.

137.     By a letter dated May 30, 2012, Plaintiff reported to Defendant MacCormack that sabbaticals had been granted to every other faculty member hired in 2005, and that there was no rational basis to treat him differently—especially, when he had viable research projects.

138.     Plaintiff emphasized that his scholarship has suffered immeasurably, evidenced by the fact that he last published anything in 2006—"because [he has] had to spend much of [his] time and mental concentration fending off the concerted efforts of the History Department, William Hogan, and Anthony Garro to destroy [his] professional and personal integrity."

139.     As usual, Defendant MacCormack did not even acknowledge receipt of that letter.

### *A Lost Research Grant From Kennedy Library Foundation*

140.     Plaintiff's letter dated May 30, 2012 informed Defendant MacCormack that the Kennedy Library Foundation awarded him a research grant in 2009 for a book project, but that he had "not even found the time to collect the check" because of "the difficulties [he] had to grapple with on daily basis at UMassDartmouth."

141.     Plaintiff's hostile work environment intensified after summer 2012 and made any research impossible. By a letter dated September 3, 2013, the Foundation informed Plaintiff that it was "closing its books on the grant because of the lapse of time."

### *Defendant Garro Attempts To Force Plaintiff Into Premature Retirement*

142.     By a letter dated November 28, 2011, Defendant Garro ordered Plaintiff to submit his file to the History Department for periodic multi-year review (PMYR). Defendant Garro acknowledged that a "number of exceptions for altering the timing of the PMYR requirement exist (see Article VII, J, 3 & 4)."  Nonetheless, he restricted Plaintiff to only

one exception: *retirement*. Defendant Garro copied the said letter to Defendants Hogan, Santow, and Griffith.

### *Foreclosing Plaintiff's Employment Opportunities*

143.    Plaintiff had to return to the job market following the 2006-2007 evaluation and its ratification by Defendants. On October 19, 2011, Plaintiff complained to Defendants MacCormack, Caret, Santos, and the Faculty Federation that: "Incidentally, potential employers have had to talk with Dean Hogan for employment verification purposes. The outcome of my job search would have been different without Dean Hogan's involvement."

144.    Plaintiff therefore advised Defendants MacCormack and Santos that Defendant Hogan "should disqualify himself—or be disqualified by you—*effective immediately* from further contact in any form with [his] potential employers." (Emphasis in the letter.)

145.    Because none of these defendants responded to this complaint, Defendant Hogan continued, until he retired in July 2012, to talk with Plaintiff's potential employers for employment verification/employer reference purposes and thereby destroyed Plaintiff's employment opportunities.

### *Defendant Hogan's Reversal Of Remedial Measure Against Unlawful Discrimination*

146.    Defendant Hogan, by his letter of November 4, 2011, ordered Plaintiff to teach a "World Civilizations II," a History Department course, in Spring 2012. By this order, he reversed a remedial measure that had been effected to remediate the Department's unlawful discrimination and continuing hostility towards Plaintiff. Defendant Hogan copied this letter to Defendants MacCormack, Garro, and Santow.

### *Hogan-Santow Reckless Disregard Of Protected Activities*

147.	On January 31, 2012, Plaintiff emailed Defendants Garro, Hogan, Santos, and Majewski, among other administrators, and informed them that he had filed a complaint with U. S. Department of Education because of Defendant Hogan's discriminatory conduct in imposing a History Department course on him.

148.	Following that email, the "world civilizations" course was promptly deleted from Plaintiff's Spring 2012 class schedule. Nonetheless, on April 11, 2012, Plaintiff found that Defendant Hogan and Santow had, yet again, imposed four History Department courses on him for Fall 2012.

***Another Hogan-Santow Conspiracy: Adverse 2011-2012 Annual Evaluation Report***

149.	Defendant Santow knows of his Department's discriminatory record with Plaintiff's evaluations and Plaintiff's complaints which caused the University to decide, in 2009, that the Department should no longer conduct Plaintiff's evaluations.

150.	Nonetheless, by a memorandum dated May 31, 2012, Defendant Santow submitted an adverse annual evaluation report for 2011-2012 concerning Plaintiff to Defendant Hogan.

***Defendant Farrington's Reckless, Deliberate Disregard For Federally Protected Rights***

151.	Fall 2012 Semester began on Saturday, September 1, 2012.[10] About a week earlier, Plaintiff checked but did not find his name in the course listings, which meant that he had no class to teach.

152.	Early on September 4, Plaintiff emailed Defendant John Farrington (then Interim Provost) and reported that he had been excluded from teaching. It was then that Defendant Farrington rather belatedly informed Plaintiff that "the decision for [Plaintiff] to be removed this semester from teaching was [Defendant Farrington's] decision."

---

[10] Classes began on September 5 because Sept. 3 was Labor Day, and Sept. 4 was Convocation.

153.    Defendant Farrington did not cite his authority to suspend Plaintiff from teaching, but he is familiar with Article III. B of the collective bargaining agreement which provides that:

> The Chancellor may, after consultation with the appropriate College Dean and Provost, suspend a faculty member from class. No faculty member may be removed from the performance of duties without full disclosure of the reasons for the intended suspension to individual concerned. The faculty member shall have the right to a hearing before the appropriate College Academic Council which shall make its recommendations to the Chancellor. Where a person has been removed from the performance of duties, the administration shall present its reasons at a hearing before the College Academic Council within five (5) school days. If the grievance is not resolved at the level of the College Academic Council, the faculty member involved may pursue the grievance, in an orderly manner, under Article XVII (Grievance Procedures) of this Agreement.

154.    One of Defendant Farrington's post hoc rationalizations for his action, mechanically copied from Defendant Hogan, was that Plaintiff had "refused to abide by the terms" of the collective bargaining agreement. As with Defendant Hogan's generalized false/pretextual allegation, Defendant Farrington did not specify the section of the agreement which Plaintiff allegedly breached.

155.    Defendant Farrington's other post hoc rationalization was that Plaintiff had "claimed several times in emails to several people at UMass-Dartmouth that [he works] in a hostile work environment...yet [Plaintiff had] not availed [himself] of opportunities to meet" with the Human Resources and/or OEODO "when they have attempted to contact [Plaintiff]."

156.    Defendant Farrington ordered Plaintiff to meet him "within the next two weeks" so that he would "provide [Plaintiff] with a series of steps needed, especially [Plaintiff's] completion of a PMYR Review [conducted by the History Department], prior to

[Plaintiff] being restored next semester to teaching status and teaching the classes assigned by [the History] department chair."

### *Deliberate, Reckless Indifference To Federally Protected Rights*

157.    Defendant Farrington's email of September 4, 2012 by which he suspended Plaintiff was copied to Defendants Riley, Fowler, Santow, Santos, and Majewski.

158.    Like Defendant Farrington, these defendants are all familiar with Article III. B of the collective bargaining agreement, and therefore knew, and still know, that Defendant Farrington acted in violation of the agreement.

### *Continuing Deliberate Indifference By The Faculty Federation & Defendant Griffith*

159.  On September 14, 2012, Plaintiff filed a grievance with the Faculty Federation concerning his suspension from teaching.

160.  As with previous complaints to the Federation and Defendant Griffith, going back to May 2008, no action was taken on this grievance. For thus breaching its duty of fair representation, Plaintiff filed a charge, still pending, against the Federation with the Massachusetts Division of Labor Relations.

### *Notice Of Protected Activity: Complaint With MCAD*

161.    On September 14, 2012, Plaintiff notified Defendants Farrington, Fowler, Santos, Riley, Santow, and Majewski that he had filed a complaint with Massachusetts Commission Against Discrimination (MCAD).

### *Denial Of Access To AAAS Office & Confiscation of Plaintiff's Mailbox & Mail*

162.    In late August 2012, Plaintiff found that the AAAS Office had been moved, by Defendant Riley, from Liberal Arts 396F to Room 356. Because Plaintiff did (and still does) not have the key to the new location, this move automatically meant his loss of

access to the office. Plaintiff took the necessary steps to get the key to the new office, but his efforts unusually came to naught.

163.     In mid-September 2012, Plaintiff found that his mailbox which has been located in the AAAS Office since September 2005 was no longer there. Confiscation of Plaintiff's mailbox has meant that since September 2012, he has not seen his official correspondence and his professional journals and newsletters.[11]

164.     In January 2013, Plaintiff complained to Defendants Thomas III, Grossman (and John Hoey, Defendant Grossman's Chief of Staff) about being denied access to the AAAS Office and the confiscation of his mailbox and mail.

165.     In June 2013, Plaintiff brought this matter to the attention of Defendant Griffith and other officials of the Faculty Federation.

166.     As usual, none of the defendants acknowledged receipt of the complaints or addressed this issue, and consequently, Plaintiff still does not have access to the AAAS Office, his mailbox and mail.

167.     The irony is that AAAS never had an office until Plaintiff established one in September 2005.

### Disregard Of Protected Activity: Denial Of 2012 Salary Raise By Defendant Santos

168.     Defendant Santos, by her letter dated October 24, 2012, informed Plaintiff that he was "ineligible for the June 30, 2012 AFT collective bargaining [salary] increases [of 1.75% increase to the base salary] based on the information provided to [them] by the FEC and Department Chair." The letter was copied to Defendant Farrington.

---

[11] American Historical Review, Perspectives (newsmagazine of the American Historical Association), African Studies Review, Chronicle of Higher Education, and AfricaRenewal.

169.     Defendant Santos did not disclose the Department whose "FEC" and Chair provided the information that supposedly served as the basis of her action and the information so provided, and did not offer Plaintiff any opportunity to rebut any adverse information that supported her decision to deny Plaintiff the salary raise.

***Further Health Complications***

170.     In December 2012, a medical test found that Plaintiff was deficient in vitamin D3, obviously because he had become reclusive and hardly stepping outdoors.  At the same time, Plaintiff was placed on anti-depressant/sleep medication. Even with this medication, Plaintiff still has the sleep difficulties that began on September 29, 2010, after his encounter with Defendants Garro and Hogan.

***Defendant Fowler's Cruel, Unjust, Unjustifiable and Inhumane Punishment***

171.     Article VII. I.1 of the collective bargaining agreement specifies, in part, that: "Until a final decision on termination has been reached, the unit member shall continue at full pay." Nonetheless, by letter dated January 3, 2013, Defendant Fowler placed Plaintiff on an indefinite "unpaid administrative leave" effective January 7, 2013.

172.     Defendant Fowler gave several post hoc rationalizations for inflicting this punishment on Plaintiff. These, he claimed, "*include*"[12] Plaintiff's "continuing refusal over the last several years to participate in any manner in the activities of the History Department, including the annual faculty evaluation."

173.     Defendant Fowler's second post hoc rationalization was Plaintiff's refusal "to respond to requests from the University administration to address this situation"—even though Defendant Fowler knew that Plaintiff had filed a complaint with MCAD.

---

[12] Plaintiff's underlined italics. Defendant Fowler thus failed to disclose to Plaintiff all the "reasons" for his action.

174. Following Defendant Fowler's letter, Defendant Santos (who supervises Payroll) promptly cut off Plaintiff's salary and benefits (health insurance, life insurance, optional life insurance, long term disability insurance, and pension).

***Callous, Inhumane Indifference To Plaintiff's Life, Liberty & Family***

175. Plaintiff and his family (wife and two kids) are totally dependent on his UMassDartmouth salary. Plaintiff also supports his aged parents. In the circumstance, the deprivation of Plaintiff's salary and benefits immediately imposed—and has continued to impose—indescribable financial punishment with unspeakable lifestyle adjustments, low standards of living, poor quality of life, incalculable financial/economic injuries, and emotional anguish on the family. Because Plaintiff's salary has still not been reinstated, these harsh conditions have worsened by the day over the past 14 months.

176. Because of the callous deprivation of Plaintiff's salary and the benefits, he had to go without diabetic medications from January 5 to May 10, 2013. Consequently, Plaintiff's Hemoglobin A1c value jumped from 6.6 on December 20, 2012 to 7.6 on May 8, 2013, which caused Plaintiff's doctor to immediately refer him to an endocrinologist.

177. The doctor was concerned because the A1c reading of 7.6—caused by Defendants Fowler, Santos, and Grossman—who needlessly and callously cut off Plaintiff's salary and health insurance—made Plaintiff susceptible to diabetes-induced, life-threatening conditions such as diabetic neuropathy (nerve disease), blurry vision and then blindness, damage to blood vessels and nerves (which could lead to heart attack and/or stroke), diabetic ketoacidosis which could result in loss of consciousness, and diabetic kidney disease (diabetic nephropathy) which could lead to end-stage kidney disease.

178.     Deprived of health insurance, Plaintiff and his family enrolled into MassHealth. This coverage was cancelled on August 26, 2013 and Plaintiff has been without insulin since then—again, exposing Plaintiff to a substantial risk of life-threatening diabetic-related complications.

179.     Because of the continuing confiscation of Plaintiff's salary, he is still unable to afford medications, keep his mandated medical appointments, eat diabetic-appropriate foods, and adequately manage this condition. Every hour Plaintiff continues in this condition exponentially multiplies his risk of these diabetes-induced complications in the short and long-terms.

***Defendant Fowler's Reckless, Deliberate Disregard For Federally Protected Rights***

180.     Defendant Fowler's letter of January 3, 2013 by which he placed Plaintiff on an indefinite "unpaid administrative leave" also commanded that: (a) "within the next thirty (30) days, [Plaintiff] must meet with [Fowler] and Interim Dean Jennifer [sic] Riley of the College of Arts and Sciences to discuss [Plaintiff's status] as a member of the History Department faculty," and (b) Plaintiff must "acknowledge [his] professional obligations going forward."

181.     Defendant Fowler asserted that "pursuant to Article VII.J of the Faculty Federation Agreement, [Plaintiff was] required to undergo a periodic multi-year review (PMYR) of [his] performance," and therefore commanded that Plaintiff "must submit the materials required for the completion of the PMYR to the History Department Faculty Evaluation Committee by February 28, 2013"

182.     Defendant Fowler threatened that: "In the event [Plaintiff fails] to meet with [Fowler] and Interim Dean Jennifer [sic] Riley and promptly initiate the required review

process and cooperate in that process, the University will consider that [Plaintiff has] abandoned [his] faculty position and will terminate [his] employment."

### Defendant Fowler Ignores Plaintiff's Letter

183.    On January 17, Plaintiff sent a letter to Defendant Fowler and reminded him that his post hoc rationalizations for placing Plaintiff on "unpaid administrative leave" had no basis in fact because UMassDartmouth had, in May 2009, and again, in a sworn Position Statement submitted to EEOC in August 2009 (a) excised the History Department from further involvement with Plaintiff's evaluations, and (b) clarified Plaintiff's employment status.

184.    Defendant Fowler was also reminded that Plaintiff had, on September 14, 2012, notified him that Plaintiff had filed a complaint with MCAD.

185.    Defendant Fowler did not respond to this letter.

### Deliberate Indifference By Defendants Thomas III and Grossman

186.    On January 11, 2013, Plaintiff emailed a 26-page complaint to Defendants Thomas III and Grossman.[13] The complaint was copied and emailed to Margaret Xifaras, member of University of Massachusetts Board of Trustees; and John Hoey, Chief of Staff to the Chancellor and Assistant Chancellor for Public Affairs, UMassDartmouth.

187.    The complaint dwelt on the systemic discriminatory harassment of Plaintiff and the resulting hostile work environment—beginning with the unlawful discriminatory evaluations of 2006-2007 and 2007-2008 to the deprivation of his salary and benefits.

188.    Plaintiff emphasized that a conscious discriminatory animus, based on his national origin, race, and color had permeated and structured how Defendants Hogan,

---

[13] The 14-page letter (of complaint) which Plaintiff had addressed and hand-delivered to Defendant MacCormack and her colleagues on October 19, 2011 was attached to the complaint.

Garro, Farrington, and Fowler "dealt" with him and unavoidably shaped any decision they made or did not make about Plaintiff as well as any sanction they inflicted on him.

189. To demonstrate the urgency of Plaintiff's complaint and invite these Defendants' attention to his complaint, Plaintiff cited his own experience as well as those of Lulu Sun (Department of English) and Joshua Awosan (Department of Sociology, Anthropology, and Crime & Justice Studies)—who endured various forms of discrimination during the same period.

190. Because there was no response from Defendants Thomas III and Grossman, and worried about the prospect of being deprived of his salary, Plaintiff re-sent the email to Defendant Grossman and John Hoey on January 14, 2013.

191. On January 17, because there was still no response, Plaintiff forwarded the email to Defendant Grossman's administrative assistant, Natalie Ferreira, and asked her to bring it to Defendant Grossman's attention.

192. On January 26, 2013, Plaintiff took the additional step of sending the complaint and its attachment to Defendant Thomas III by certified U.S. postal mail.

193. To this day, none of these Defendants has even acknowledged receipt of the complaint.

***Defendant Fowler's Continuing Reckless, Deliberate Disregard For Federally Protected Rights***

194. MCAD mailed copies of Plaintiff's complaint to all the Respondents on January 28, 2013.[14] Defendant Fowler must have received his copy of the complaint by February 1, and knew immediately that Plaintiff had named him as an individual Respondent.

---

[14] As shown by the postage mark on the envelope containing the complaint mailed to Plaintiff.

195.    Nonetheless, Defendant Fowler, by his letter dated February 12, 2013, informed Plaintiff that he "will be recommending" to Defendant Grossman that Plaintiff's "employment be terminated for cause." Defendant Fowler added that he was *"sorry that [Plaintiff's] position as a member of our faculty did not work out for [Plaintiff]" and that he wished Plaintiff "well in [Plaintiff's] future employment."* Defendant Fowler copied this letter to Defendants Grossman, Riley, Santos, and Griffith.

### Defendant Fowler's Dismissive Response To Grievance Committee Report

196.    Following Plaintiff's grievance, a Faculty Grievance Committee met on March 29, 2013 and found that Defendant Fowler's "decision to withhold pay and benefits from" Plaintiff "clearly violates the terms of the [collective bargaining] Agreement" and therefore recommended that Plaintiff's "pay and benefits be retroactively restored."

197.    Defendant Fowler, by his letter of April 23, 2013, offhandedly dismissed this finding and recommendation. Without citing any authority for his position, Defendant Fowler asserted that he "did not agree with the Committee that the University violated the labor agreement by suspending the grievant's compensation."

198.    Defendant Fowler asserted that: "The grievant has ignored instructions from this office, has failed to participate in the evaluation process required of all unit members, and has failed to render services required of all faculty under the labor agreement. It is implicit in the authority of the University and in the concept of fairness to cease compensating an employee who has ceased rendering services. Indeed, the University is justified in concluding that the grievant, by ignoring the direction of the University, has abandoned his position here."

### Defendant Riley Defends Illegitimate Conducts Of Defendants Farrington And Fowler

199.     Defendant Riley appeared for Defendant Fowler before the Faculty Grievance

Committee on March 29, 2013, and mounted a spirited but baseless defense of the

deprivation of Plaintiff's federally protected rights by Defendants Fowler and Farrington.

Her rationalizations were that Plaintiff had refused to teach courses "assigned" to him by

Defendant Santow, and that Plaintiff had refused to participate in the History

Department's annual evaluations.

***Defendant Robert Caret's Deliberate Indifference***

200.     On June 17, 2013, Wayne Leblance of the Faculty Federation notified Plaintiff

that the Federation had "filed a grievance...regarding the cessation of [his] compensation

without a decision by President Caret."

***"Paid Administrative Leave" As An Unconstitutional Condition***

201.     Following a self-serving "grievance" filed by the Faculty Federation, Defendant

Grossman, on July 10, 2013, "instructed the Office of Human Resources to move

Professor Nwaubani from unpaid administrative leave to paid administrative leave," and

"process his compensation and other conditions from January 7, 2013 retroactively."

202.     Defendant Grossman's decree was addressed to Defendant Griffith and copied to

Karim Mohammad (Provost), Defendants Riley and Santos, and Plaintiff.

203.     Defendant Grossman did not put a time limit on the "paid administrative leave,"

did not give any reason or cite her authority place Plaintiff on an indefinite "paid

administrative leave."

204.     Defendant Grossman knew that Plaintiff had, in September 2012, filed a

complaint with MCAD; and that Plaintiff had amended the complaint to include her as an

individual respondent. MCAD mailed the necessary papers to Defendant Grossman on Friday, June 28, 2013.

205.    In light of the foregoing, Plaintiff rejected Defendant Grossman's decree placing him on an indefinite, undefined "paid administrative leave."

### Denial Of Annual Merit Pay Increases "since July 8 2007"

206.    In the UMassDartmouth Position Statement, submitted to EEOC in response to Plaintiff's complaint in 2009, Defendants claimed that there had been "no merit increase since July 8, 2007," and thus the annual evaluation process for academic year 2007-2008 had no merit increase attached to it."[15]

207.    But the MCAD *Lulu Sun* decision, in 2011, noted that: "In addition to salary increases announced by the Office of Human Resources, there are also annual merit pay increases. Associate and Full Professors in the College of Arts and Sciences received annual merit pay increases of 1% for the academic years 205-2006, 2006-2007, and 2007-2008.[16]

208.    Based on the above, Plaintiff has been denied annual merit pay increases "since July 8, 2007" without any reason and/or justification.

### Denial Of The 2013 Pay Raise

209.    On July 15, 2013, Defendant Santos notified campus employees of the 2013 salary increases that went into effect on June 30, 2013 for various categories of employees. For full-time faculty, the increase was 1.75 percent. As in 2011 and 2012, Plaintiff was denied the 2013 salary increase.

---

[15] Position Statement of the University of Massachusetts, Dartmouth in the Case of Nwaubani v. University of Massachusetts – Dartmouth, EEOC Charge No. 523-2009-00419 (August 7, 2009), p. 1.
[16] See *Professor Lulu Sun and Massachusetts Commission Against Discrimination v. University of Massachusetts Dartmouth*, Docket No. 05 BEM 00783/06-BEM-02993 (June 1, 2011), p. 44.

### *Unlawful Retaliation For Filing Lawsuit*

210.     Plaintiff filed this lawsuit on October 11, 2013. On November 1, 2013, Plaintiff's

attorney asked two UMassDartmouth officials, Danielle-Drabble-Almeida (Benefits

Coordinator) and Christina Flagg (Payroll Supervisor) for Defendants' home addresses

for the purpose of serving them the court papers. There was no response to this request

and a second request made on November 8.

211.     On November 15, 2013, Plaintiff received a letter dated 11-08-2013 from Deidre

Heatwole, University of Massachusetts General Counsel, informing him that "the

University of Massachusetts Board of Trustees will consider the recommendation of the

Dartmouth campus to terminate [his] employment for cause" first at a meeting of the

Board's Committee of Academic and Student Affairs (CASA) on November 20, 2013;

and "[i]f there is a vote in CASA recommending termination, the Board of Trustees will

consider this recommendation at its meeting on December 11, 2013." Heatwole notified

Plaintiff that the Board "has elected to convene in executive session at both CASA, and if

necessary, at the full Board meeting."

212.     Heatwole copied her letter to Plaintiff's attorney, information she obtained from

the Complaint and accompanying documents.

213.     On November 13, 2013, Heatwole informed Plaintiff's attorney that Plaintiff's

employment status "will <u>not</u> be on the agenda for November 20th, and will also <u>not</u> be

considered by the Board at its December 11th meeting. Therefore [Plaintiff] will continue

as an employee of UMass Dartmouth until ***further notice***" (underlinings in Heatwole's

original email; bold italics is Plaintiff's).

214. Because Plaintiff had not received or seen "the recommendation of the Dartmouth campus to terminate [his] employment," his attorney immediately asked Heatwole for the document. She did not provide the document.

### *Defendant Majewski's Response To The Lawsuit*

215. By a letter dated November 13, 2013, Defendant Majewski  informed MCAD that the "University has received notice" that Plaintiff had filed a lawsuit in federal court against "Divina Grossman, Alex Fowler, et al." and "alleged similar claims to those he asserted with the MCAD (retaliation and racial discrimination, among others)."

216. Although Defendant Majewski had only "received notice" of Plaintiff's lawsuit, and was not familiar with the complaint to support her contention that the claims were similar, she asked that "Dr. Nwaubani's MCAD charge be dismissed" if MCAD had not issued Plaintiff with a right to sue letter.

### *Defendant Caret's Renewed Retaliatory Plot To Terminate Plaintiff's Employment*

217. The retaliatory "recommendation" to terminate Plaintiff's employment and the Board's speedy scheduling of the "recommendation" for immediate consideration caused Plaintiff to amend his Complaint and seek injunctive relief against all Defendants. All Defendants were served with the Amended Complaint and the motion for injunctive relief on February 4-6, 2013.

218. Nonetheless, Defendant Caret overnighted a letter dated February 24, 2014 and titled "RE: Notice of pre-termination hearing" separately to Plaintiff and his attorney. In the letter, copied to Defendant Grossman, Defendant Caret stated that he had hand-picked one Robert Banks of Michigan State University to conduct the hearing, required Plaintiff to respond by 5:00 p.m. Monday, March 3, 2014 if Plaintiff wanted a hearing; otherwise

he "will make [his] recommendation to the Board [of Trustees] based on the materials previously provided to [him]" by Defendant Grossman.

219.    The "recommendation of the Dartmouth campus" [17] to terminate Plaintiff's employment, which Defendant Caret enclosed, was an expanded version of the deceitfully contrived fabrications of Defendants Hogan, Farrington, and Fowler. The "recommendation" was written by Defendant Fowler; Defendants Riley and Santow gave their consent, and Defendant Grossman approved.

## VI. SUMMARY OF THE CONSEQUENCES

220. As a direct and proximate result of Defendants' systemic, pervasive, and persistent deprivation of Plaintiff's constitutional rights, Plaintiff has suffered and continues to suffer incalculable injuries and damages, which have had devastating consequences on his personal and professional life.

221.    Plaintiff and his family have not had any quality time since 2007, no vacation, no celebration of birthdays and anniversaries, no family outing, not even taking the kids out to local parks or bike-riding. Since 2007 too, Plaintiff has become increasingly reclusive, withdrawn from the world around him in every sense. He has hardly been in contact with his brothers, and has lost contact with the rest of the extended family, friends and professional colleagues. Contact with his parents has been minimal: he has not called them since October last year.

222.    Both at home and in his office, there are piles of newspapers and magazines dating back to 2007, which Plaintiff has not read. Since then, Plaintiff has not stepped into any university/research library, which means that he is well behind developments in

---

[17] Defendant Grossman copied the materials to Defendants Griffith and Santos. Neither the "recommendation" nor Defendant Caret provided for a hearing by Dartmouth campus faculty—a standard practice in American higher education, including the University of Massachusetts.

his professional fields. And, of course, he last published anything in 2006, leading to loss of reputation and visibility in his professional fields. Similarly, Plaintiff is not abreast with developments in classroom/research new media since 2007.

223.     Artificial suppression of Plaintiff's earning capacity (through denial of salary increases, annual merit pay increases, and promotion) has severely limited his options in terms of where to live and the school his kids attend and imposed on him unwarranted financial stress/difficulties and relatively low standard of living.

224.     Plaintiff's career has retrogressed because Defendants have obstructed his professional advancement with solid artificial barriers. By imposing unconstitutional discriminatory wage and promotion sanctions on Plaintiff, Defendants have sentenced plaintiff to lower returns to investment in human capital in the short and long runs.

225.     Plaintiff received diabetes diagnosis in March 2008. Because of the correlation between stress and blood glucose levels, the hostile work environment catalogued above has either contributed to the onset of this condition or complicated its management.

226.     Since October 2010, Plaintiff has had chronic headache and sleep difficulties;  he has had recurring chest pains since February 2011, and he has been on anti-depressant medication since December 2012.

227. As a result of the  persistent and pervasive unlawful discriminatory actions of the Defendants against Plaintiff, Plaintiff has been suffering from anxiety, depression, feelings of hopelessness, loss of trust, loss of confidence in and feelings of betrayal by the university system, shock, and emotional scarring, all compensable as emotional distress, and other damages.

## VII.     CAUSES OF ACTION

### **Count 1: Procedural Due Process Deprivation (Protected Property Interest)**
**Against Defendants Hogan, MacCormack, Caret,  Garro, Santos, Griffith, Majewski, Grossman, and Thomas III**

228.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

229.     Defendant Hogan, by ousting Plaintiff from the Director position, as described; and Defendants MacCormack, Caret,  Garro, Santos, Griffith, Majewski, Grossman, and Thomas III, by remaining deliberately indifferent to Plaintiff's complaints on this matter and adopting Defendant Hogan's unconstitutional conduct as an institutional policy— deprived Plaintiff of a protected property interest without procedural due process guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### **Count 2: Procedural Due Process Deprivation (Protected Property Interest)**
**Against Defendants Hogan, Santos, MacCormack, Garro, Griffith, and Farrington**

230.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

231.     Defendants Hogan and Santos, by denying Plaintiff annual merit pay increases and salary increases in the manner described above; and Defendants MacCormack, Garro, Griffith, and Farrington (who had contemporaneous, personal knowledge of some of these deprivations), by their endorsement of these constitutional transgressions— deprived Plaintiff of protected property interests without procedural due process guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### **Count 3: Procedural Due Process Deprivation (Protected Property Interest)**
**Against Defendants Farrington, Fowler, Griffith, Grossman, Majewski, Riley, Santos, Santow, and Thomas III**

232.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

233.     Defendant Farrington, by suspending Plaintiff in egregious violation of the due process procedures of Article III. B. of the collective bargaining agreement; Defendants Grossman, Fowler, Majewski, Riley, Santos, and Santow (who had contemporaneous, personal knowledge of this unconstitutional conduct), by their endorsement of Defendant Farrington's constitutional transgression; and Defendants Griffith, Grossman and Thomas III, by their deliberate indifference to Plaintiff's complaints and by adopting Defendant Farrington's unlawful conduct as an institutional policy—deprived Plaintiff of a protected property interest without procedural due process guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

**Count 4: Procedural Due Process Deprivation (Protected Property Interest)**
**Against Defendants Riley, Grossman, Griffith, and Thomas III**

234.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

235.     Defendant Riley, by denying Plaintiff access to the AAAS Office and confiscating his mailbox and mail located in the AAAS Office as described; and Defendants Grossman, Griffith, and Thomas III, by their deliberate indifference to Plaintiff's complaints on this matter—deprived Plaintiff of protected property interests without procedural due process guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

**Count 5: Procedural Due Process Deprivation (Protected Property Interest)**
**Against Defendants Fowler, Grossman, Riley, Griffith, Santos, and Thomas III**

236.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

237.     Defendant Fowler, by placing Plaintiff on "unpaid administrative leave" as described; Defendants Grossman, Riley, and Santos (who had contemporaneous, personal knowledge of this unconstitutional deprivation), by their immediate endorsement of this constitutional transgression; and Defendants Griffith, Grossman and Thomas III, by their deliberate indifference to Plaintiff's complaints and by adopting Defendant Farrington's unconstitutional conduct as an institutional policy—deprived Plaintiff of a protected property interest without procedural due process guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

**<u>Count 6: Procedural Due Process Deprivation (Protected Property Interest)</u>**
**Against Defendants Fowler and Santos, and Grossman**

238.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

239.     Defendants Fowler and Santos, by cutting off Plaintiff's benefits as described; and Defendant Grossman, by her immediate endorsement of this constitutional transgression, deprived Plaintiff of a protected property interest without procedural due process guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

**<u>Count 7: Procedural Due Process Deprivation (Protected Property Interest)</u>**
**Against Defendants Grossman, Griffith, Riley, and Santos**

240. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

241.     Defendant Grossman, by placing Plaintiff on an indefinite "paid administrative leave"—without a hearing, without a notice or even stipulating the reason(s) for her action—and especially by doing so when Plaintiff had already been on suspension from teaching for one academic year and on "unpaid administrative leave" for 7 months; and

Defendants Griffith, Riley, and Santos (who had contemporaneous, personal knowledge of this unconstitutional deprivation), by their endorsement of this constitutional transgression—deprived Plaintiff of a protected property interest without procedural due process guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 8: Procedural Due Process Deprivation (Protected Property Interest)
**Against Defendants Fowler, Grossman, Griffith, Riley, and Santos**

242.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

243.    Defendant Fowler, by deciding entirely on his own—without any hearings, without even stipulating any reasons for termination of employment as required by Article VII.I.1 of the collective bargaining agreement—that Plaintiff's employment should be terminated "for cause" and adding, at the same time, that he was "*sorry that [Plaintiff's] position as a member of our faculty did not work out for [Plaintiff]" and that he wished Plaintiff "well in [Plaintiff's] future employment*"; and Defendants Grossman, Riley, Santos, and Griffith, by having contemporaneous, personal knowledge of and endorsing these constitutional transgressions as institutional policy, deprived Plaintiff of his procedural due process rights guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 9: Procedural Due Process Deprivation (Protected Property Interest)
**Against Defendants Fowler, Grossman, Riley and Santos**

244.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

245. By his letter dated January 3, 2013, Defendant Fowler threatened that if Plaintiff failed to satisfy his arbitrary conditions, "the University will consider that [Plaintiff has] abandoned [his] faculty position and will terminate [his] employment."

246. Defendant Fowler, by his letter dated February 12, 2013, announced his decision to terminate Plaintiff's employment and concluded by stating that he was "*sorry that [Plaintiff's] position as a member of our faculty did not work out for [Plaintiff]*" and that he wished Plaintiff "*well in [Plaintiff's] future employment*."

247. Defendant Fowler's dismissive response to the Faculty Grievance Committee's finding/recommendation included his assertion that "the University is justified in concluding that the grievant, by ignoring the direction of the University, has abandoned his position here."

248. Defendant Fowler, by the above comments which explicitly communicated a pre-determined plot to terminate Plaintiff's employment; and Defendants Grossman, Riley, and Santos, by having contemporaneous, personal knowledge of and endorsing Defendant Fowler's comments and their implication as an institutional policy, deprived Plaintiff of his procedural due process rights guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

**Count 10: Procedural Due Process Deprivation (Protected Property Interest)**

**Against Defendant Thomas III**

249. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

250. By hurriedly scheduling the constitutionally flawed "recommendation of the Dartmouth campus to terminate [Plaintiff's] employment" for hearings by the Board of

Trustees when the "reasons for termination of employment" mandated by the Article VII. I.1. of the collective bargaining agreement had not been stipulated to Plaintiff, when the expressly required "decision of the President" was not before the Board, and when Plaintiff had not received pre-termination hearings, Defendant Thomas III violated Plaintiff's procedural due process rights guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 11: Procedural Due Process Deprivation (Protected Property Interest) Against Defendant Thomas III

251.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

252.     Defendant Thomas III, by disregarding the 26-page complaint which Plaintiff sent to him in January 2013 while promptly scheduling the unusually hurried "recommendation of the Dartmouth campus to terminate [Plaintiff's] employment" for immediate hearings, and by his deliberate indifference to the fundamental procedural irregularities embedded in the constitutionally flawed plot to terminate Plaintiff's employment, forfeited the Board's presumption of honesty, integrity, and impartiality and thereby deprived Plaintiff of his protected due process right—to have an unbiased Board of Trustees make decisions concerning his constitutionally protected property interests— guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 12: Procedural Due Process Deprivation (Protected Property Interest) Against Defendants Farrington, Fowler, Garro, Grossman, Hogan, MacCormack, Riley, Santos, and Santow

253.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

254.    This Complaint has adduced sufficient evidence showing that all the decisions made by the above-named Defendants concerning Plaintiff's employment have been consistently biased thereby depriving Plaintiff of his protected due process right—to have unbiased decision-makers make decisions concerning his constitutionally protected property interests—guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 13: Procedural Due Process Deprivation (Stigma Plus)
**Against Defendants**
**Santow, MacCormack, Caret, Garro, Hogan, Majewski, and Santos**

255.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

256.    Defendant Santow, by circulating his false and derogatory email of September 21, 2011 in connection with the irrational and arbitrary removal of Plaintiff from the Director position; and Defendants  MacCormack, Caret, Garro, Hogan, Majewski, and Santos, by their deliberate indifference to Plaintiff's complaint and by failing to provide Plaintiff with a name-clearing opportunity, stigmatized Plaintiff—and thereby deprived him of liberty interests without procedural due process guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 14: Procedural Due Process Deprivation (Protected Liberty Interest)
**Against Defendants**
**Caret, Farrington, Fowler, Garro, Grossman, Hogan, Santos, and Santow**

257.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

258.     By planting documents[18] containing information sufficiently derogatory to damage Plaintiff's standing and associations in his professional communities, the above-named Defendants deprived Plaintiff of liberty interests without procedural due process guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 15: Procedural Due Process Deprivation (Protected Liberty Interest)
### Against Defendants Caret, Farrington, Fowler, Garro, Grossman, Hogan, MacCormack, Santos, and Thomas III

259.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

260.     By blocking Plaintiff from applying for promotion and denying him salary increases and annual merit pay increases or by endorsing these constitutional transgressions through deliberate indifference to Plaintiff's complaints, the named Defendants artificially and significantly suppressed Plaintiff's earning capacity in the short, mid, and long-terms, and thereby deprived him of his protected liberty interests—to establish a home, bring up his children, and enjoy the privileges recognized as essential to the orderly pursuit of happiness—without procedural due process guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 16: Procedural Due Process Deprivation (Protected Liberty Interest)
### Against Defendants  Caret, Farrington, Fowler, Garro, Griffith, Grossman, Hogan, MacCormack, Majewski, Riley, Santos, and Santow

261.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

262.     By subjecting Plaintiff to incomparably hostile working conditions, blocking his professional advancement, constructively discharging him, foreclosing his employment

---

[18] These are documents relating to the exceptionally severe materially adverse employment actions they have taken against Plaintiff.

with other employers, and damaging his standing in his professional communities and associations or by endorsing these constitutional transgressions through deliberate indifference to Plaintiff's complaints, the named Defendants deprived Plaintiff of liberty interests—to be free in the enjoyment of his faculties, to practice his profession, and to earn a livelihood—without procedural due process guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 17: Substantive Due Process Deprivation
**Against Defendants Garro, Hogan, MacCormack, Majewski, Santos, Grossman, Farrington, Fowler, Riley, Caret, Griffith, and Thomas III**

263.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

264.    Defendants Garro, Hogan, Santos, Grossman, Farrington, Fowler, and Riley have not only refused to implement the remedial measures UMassDartmouth submitted to EEOC and remained deliberately indifferent to Plaintiff's complaints on this matter; they have subjected Plaintiff to exceptionally severe retaliatory discriminatory actions as a consequence of their obdurate refusal to implement the remedial measures.

265.    Defendants MacCormack, Majewski, Caret, Griffith, Grossman, and Thomas III have not only remained deliberately indifferent to Plaintiff's complaints on this matter and allowed Plaintiff to be subjected to exceptionally severe retaliatory discriminatory actions as a consequence of the non-implementation of the remedial measures, they have adopted non-implementation of the measures as an institutional policy.

266.    The named Defendants, by their irrational, arbitrary, capricious, oppressive and unconstitutionally coercive conducts, deprived Plaintiff of his substantive due process rights guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 18: Substantive Due Process Deprivation
### Against Defendant Hogan

267.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

268.  As described above, Defendant Hogan deceitfully contrived the false narrative centered on the fiction of Plaintiff's noncompliance with the collective bargaining agreement and his responsibilities as a tenured faculty. He subsequently perpetuated this deceitfully contrived false narrative, and as consequence, molded a university administration permeated with unfounded lies about Plaintiff's employment record and work ethic.

269.     By thus acting irrationally, capriciously, unprofessionally, with evil intent and bad faith, Defendant Hogan willfully and maliciously deprived Plaintiff of his substantive due process rights guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 19: Substantive Due Process Deprivation
### Against Defendants Farrington, Fowler, Grossman, Riley, and Santos

270. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

271. By willfully and maliciously adopting and embellishing Defendant Hogan's deceitfully contrived false narrative as the false, pretextual basis for subjecting Plaintiff to discriminatory harassment and deprivation of his constitutional rights, Defendants Farrington, Fowler, Grossman, Riley, and Santos acted irrationally, capriciously, unprofessionally, with evil intent and bad faith, and thereby deprived Plaintiff of his

substantive due process rights guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 20: Substantive Due Process Deprivation
### Against Defendants
### MacCormack, Caret, Santos, Griffith, Majewski, Grossman, and Thomas III

272.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

273.    By their deliberate indifference to Plaintiff's complaints that he is being subjected to severe discriminatory harassment and unconstitutional deprivations on the basis of a deceitfully contrived false narrative, Defendants MacCormack, Caret, Santos, Griffith, Majewski, Grossman, and Thomas III acted irrationally, capriciously, unprofessionally, with evil intent and bad faith, and thereby deprived Plaintiff of his substantive due process rights guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 21: Substantive Due Process Deprivation
### Against Defendants Farrington, Grossman, Fowler, Majewski, Riley, Santos, Santow, Griffith, and Thomas III

274.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

275.    By suspending Plaintiff in the manner described, Defendant Farrington acted arbitrarily and capriciously, exceeded the authority of his office, egregiously violated University policies and procedures, deprived Plaintiff of his procedural due process rights, and attached unconstitutional conditions to Plaintiff's continuing enjoyment of his protected property interests.

275.    By taking this action when he knew that Plaintiff had "claimed several times in emails to several people at UMass-Dartmouth that [he works] in a hostile work environment," Defendant Farrington exacerbated this impermissible working condition and thereby acted irrationally, arbitrarily and capriciously and in a manner so lacking in professional judgment and commonsense.

276.    Defendants Grossman, Fowler, Majewski, Riley, Santos, and Santow had contemporaneous, personal knowledge of, and endorsed, Defendant Farrington's irrational conduct. Defendants Griffith, Grossman and Thomas III not only remained deliberately indifferent to Plaintiff's complaints on this matter, they adopted this irrational conduct as an institutional policy.

277.    By these arbitrary, capricious, oppressive, unreasonable conducts, the named Defendants deprived Plaintiff of his substantive due process rights guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

## Count 22: Substantive Due Process Deprivation
### Against
### Defendants Fowler, Santos, Grossman, Riley, Griffith, Caret, and Thomas III

278.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

279.    Defendants Fowler and Santos, by callously and unjustly confiscating Plaintiff's salary in violation of University policy; Defendants Grossman and Riley (who had contemporaneous, personal knowledge of this unusually cruel and unjust punishment), by their callous endorsement of this unjustifiable and inhumane punishment; Defendants Griffith, Grossman, Caret, and Thomas III, by their deliberate indifference to Plaintiff's complaints and plight, and by callously adopting the cruel, unjust, and inhumane

confiscation of Plaintiff's salary as an institutional policy—acted with evil intent to deprive Plaintiff of the minimal civilized measures of life's necessities.

280.     By thus acting with callous indifference and in conscious disregard of the foreseeable and unjustifiable risk of causing incalculable and irreparable harm to Plaintiff, these Defendants deprived him of his substantive due process right, to be free from unnecessary harm, guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 23: Substantive Due Process Deprivation
### Against
### Defendants Fowler, Santos, Grossman, Riley, Griffith, Caret, and Thomas III

281.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

282.     Defendants Fowler and Santos, by callously and inhumanely depriving Plaintiff of his salary and health insurance in violation of University policy; Defendants Grossman and Riley (who had contemporaneous, personal knowledge of this unusually cruel and unjust punishment), by their callous endorsement of this unjustifiable and inhumane punishment; Defendants Griffith, Grossman, Caret, and Thomas III, by their deliberate indifference to Plaintiff's complaints and plight, and by callously adopting the cruel, unjust, and inhumane confiscation of Plaintiff's salary and benefits as an institutional policy—callously and cruelly deprived Plaintiff of his diabetic medications from January to May 2013 and from August 26, 2013 till date, and thereby willfully and maliciously exposed him to a substantial risk of life-threatening diabetic-related complications.

283.     By acting with evil intent, with callous indifference and in conscious disregard of the foreseeable and unjustifiable risk of causing incalculable and irreparable harm to

Plaintiff, these Defendants deprived him of his substantive due process right, to be free from unnecessary harm, guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

## Count 24: Substantive Due Process Deprivation
### Against Defendant Grossman, Griffith, Riley, and Santos

284.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

285.     By placing Plaintiff on an indefinite, undefined, open-ended "paid administrative leave" without due process of law, Defendant Grossman conditioned the reinstatement of Plaintiff's salary upon his renunciation of constitutional right to procedural due process. By failing to cite any authority for her conduct, Defendant Grossman acted arbitrarily, in a lawless assertion of power.

286.     Defendant Grossman, by her unconstitutionally coercive actions; and Defendants Griffith, Riley, and Santos who had contemporaneous, personal knowledge of, and endorsed, Defendant Grossman's unconstitutional condition and lawless assertion of power—all acted irrationally, arbitrarily, capriciously, oppressively, in bad faith, and in an egregious abuse of power—and thereby deprived Plaintiff of his substantive due process rights guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

## Count 25: Substantive Due Process Deprivation
### Against Defendants Caret, Farrington, Fowler, Garro, Griffith, Grossman, Hogan, MacCormack, Majewski, Riley, Santos, Santow, and Thomas III

287.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

288.    Since October 2010, the named Defendants have fixated, with single-minded ruthlessness, on terminating Plaintiff's employment on the basis of false allegations deceitfully contrived with unlawful discriminatory intent and for unlawful discriminatory purposes.

289.    Each Defendant has directly contributed to this ill-motivated and constitutionally flawed plot by willfully and maliciously subjecting Plaintiff to unconstitutionally discriminatory, exceptionally severe materially adverse employment actions; by willfully and maliciously endorsing these adverse actions; by adopting or acquiescing in the prejudicial manipulation of University policies for this illegitimate enterprise; or by showing reckless indifference to Plaintiff's federally protected rights.

290.    Defendants, by their unconstitutional plot to terminate Plaintiff's employment in a spiteful effort to "get" him for reasons wholly unrelated to any legitimate objective, deprived Plaintiff of his substantive due process rights guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 26: Substantive Due Process Deprivation
### Against Defendants Caret and Grossman

291.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein

292. Defendants Caret and Grossman, by their retaliatory plot to terminate Plaintiff's employment *after and because* he filed this lawsuit in October 2013, have acted vindictively and oppressively, in a manner so lacking in justification, professional judgment and unbecoming of the people of Massachusetts and their University; knowingly and recklessly violated University policies and procedures in an egregious abuse of power and process; and with reckless indifference to Plaintiff's federally

protected rights—and thereby deprived him of his substantive due process rights guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 27: Substantive Due Process Deprivation
**Against Defendants Caret, Farrington, Fowler, Grossman, Griffith, Hogan, MacCormack, Majewski, Riley, Santos, and Santow**

293.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

294.    Defendants Caret, Farrington, Fowler, Grossman, Griffith, Hogan, MacCormack, Majewski, Riley, Santos, and Santow, by acting against Plaintiff on the basis of their personal and unconstitutional animus (discriminatory animus, personal hostility, malice, and ill-will), with unlawful discriminatory intent, and for unlawful discriminatory purposes—and thus consistently acting irrationally, arbitrarily, capriciously, and in a manner so lacking in justification, professional judgment, and commonsense—deprived Plaintiff of his substantive due process rights guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 28: Substantive Due Process Deprivation
**Against Defendants Caret, Farrington, Fowler, Garro, Griffith, Grossman, Hogan, MacCormack, Majewski, Riley, Santos, Santow, and Thomas III**

295.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

296.    Defendants Farrington, Fowler, Garro, Grossman, Hogan, Riley, Santos, and Santow, by subjecting Plaintiff to brutal discriminatory harassment/hostile work environment as catalogued above; and Defendants MacCormack, Caret, Griffith, Thomas III, and Majewski, by their deliberate indifference to Plaintiff's complaints about his intolerably hostile work environment, and by making it an institutional policy to subject

Plaintiff to brutal discriminatory harassment/hostile work environment—deprived Plaintiff of his substantive due process rights guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 29: Deprivation Of Equal Protection
### Against Defendant Hogan

297. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

298. Compared with other Chairpersons and Directors in the College of Arts and Sciences such as Gerard Koot and Frank Sousa, who do not belong to Plaintiff's protected classes, Defendant Hogan intentionally singled out Plaintiff and willfully subjected him to different, punitive, and unequal treatment.

299. Defendant Hogan acted without rational basis, with discriminatory intent and discriminatory purpose against Plaintiff because of his national origin—and also race and color—and thereby deprived him of equal protection for all persons under the law guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 30: Deprivation Of Equal Protection
### Against Defendants
### Farrington, Fowler, Garro, Grossman, Hogan, Riley, Santos, and Santow

300. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

301. Defendants Farrington, Fowler, Garro, Grossman, Hogan, Riley, Santos, and Santow have intentionally singled out Plaintiff and willfully subjected him to a hostile work environment incomparably worse than the experience of any and all possible past and present similarly situated UMassDartmouth employees.

302.     A sharp contrast is provided by the preferential treatment of Linsun Cheng, Gerard Koot, Betty Mitchell, Len Travers, and Brian Williams, none of whom belongs to Plaintiff's protected classes. Although these individuals *actually* violated the collective bargaining agreement and their professional obligations with their impermissibly discriminatory reviews of Plaintiff's job performance, they have not suffered the least possible inconvenience, not even a verbal reprimand—because University policy privileges their national origins, races and skin colors.

303.     The named Defendants have acted without rational basis, but with discriminatory intent and discriminatory purpose against Plaintiff because of his national origin—and also race and color—and thereby deprived him of equal protection for all persons under the law guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

## Count 31: Deprivation Of Equal Protection
### Against Defendants MacCormack, Grossman, Santos, Caret, and Thomas III

304.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

305.     Plaintiff has provided sufficient information to Defendants MacCormack, Grossman, Santos, Caret, and Thomas III showing that he has been intentionally singled out because of his national origin—and also his race and color—and willfully subjected to a hostile work environment incomparably worse than the experience of any and all possible past and present similarly situated UMassDartmouth employees.

306.     For a sharp contrast, Plaintiff's complaints have cited the preferential treatment of Linsun Cheng, Gerard Koot, Betty Mitchell, Len Travers, and Brian Williams.

307.     Defendants Grossman and Santos have—and Defendant MacCormack had— sufficient information, based on the internal complaints of Plaintiff and Joshua Awosan,

to know that Nigerian-born employees are being especially subjected to invidious discrimination, and therefore to different, unfavorable, and unequal terms and conditions of employment, including but not limited to, opportunities for hiring, promotion, job assignment, and compensation.

308.     Defendants MacCormack, Grossman, Santos, Caret, and Thomas III, by their intentional or deliberate indifference to Plaintiff's complaints thereby authorizing and directly contributing to subjecting Plaintiff to different and unequal treatment, and by acting without rational basis, but with discriminatory intent and discriminatory purpose against Plaintiff because of his national origin—and also race and color—deprived him of equal protection for all persons under the law guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 32: Deprivation Of Equal Protection
**Against Defendant Griffith**

309.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

310.     Plaintiff has provided sufficient information to Defendant Griffith showing that he has been intentionally singled out because of  his national origin—and also his race and color—and willfully subjected to exceptionally severe materially adverse employment actions that are incomparably worse than the experience of any and all possible past and present similarly situated UMassDartmouth employees.

311.     For a sharp contrast, Plaintiff's complaint of October 19, 2011 cited Linsun Cheng, Gerard Koot, Betty Mitchell, Len Travers, and Brian Williams, who ***actually*** violated the collective bargaining agreement and their professional obligations with their

impermissibly discriminatory reviews of Plaintiff's job performance, but have not suffered the least possible inconvenience, not even a verbal reprimand.

312.     Defendant Griffith, by his intentional or deliberate indifference to Plaintiff's complaints thereby endorsing and encouraging treating Plaintiff differently and unfavorably, by acting without rational basis, but with discriminatory intent and discriminatory purpose because of Plaintiff's national origin—and also race and color— deprived him of equal protection for all persons under the law guaranteed by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

### Count 33: First Amendment Retaliation
### Against Defendants Hogan and Santow

313.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

314.     Following Defendant Hogan's imposition of a History Department course on Plaintiff in November 2011—thereby intentionally undoing a remedial measure effected in 2009 to remediate the Department's discriminatory practices against Plaintiff— Plaintiff filed a complaint with U. S. Department of Education in January 2012 and informed Defendants Garro, Hogan, Santos, and Majewski of this complaint.

315.     In response, Defendants Hogan and Santow imposed four History Department courses on Plaintiff for Fall 2012. By this unlawful retaliation, Defendants Hogan and Santow violated Plaintiff's constitutionally protected right, guaranteed by the First Amendment Petition Clause and enforced by 42 U.S.C. § 1983, to petition the government for redress of his grievances.

### Count 34: First Amendment Retaliation
### Against Defendants Farrington, Fowler, Riley, Santos, and Majewski

316.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

317.    Like Defendants Hogan, Santos, Majewski and Santow, Defendants Farrington, Fowler, and Riley know that Plaintiff filed a complaint with the U.S. Department of Education because of  Defendant Hogan's discriminatory imposition of a History Department course on him for Spring 2012; and that Plaintiff had complained to several administrators, including Defendants Santos and Majewski, in May 2012 that Defendants Hogan and Santow had unlawfully retaliated against him by irrationally imposing History Department courses on him for Fall 2012.

318.    Nonetheless, Defendants Farrington, Fowler, and Riley not only charged Plaintiff with "refusing" to teach  the courses Defendants Hogan and Santow had unlawfully imposed on him, they used this charge as a pretextual basis for subjecting Plaintiff to exceptionally severe materially adverse employment actions. In addition, Defendants Farrington, Fowler, and Riley made determined efforts to coerce, intimidate and  bully Plaintiff into teaching those courses.

319.    Defendants Farrington, Fowler, and Riley, by their constitutional transgressions; and Defendants Santos, Majewski, and Grossman, by knowing of and endorsing these transgressions, unlawfully retaliated against Plaintiff, and thereby violated his constitutionally protected right, guaranteed by the First Amendment Petition Clause and enforced by 42 U.S.C. § 1983, to petition the government for redress of his grievances.

**<u>Count 35: First Amendment Retaliation</u>**
**Against Defendants Riley, Grossman, Thomas III, and Griffith**

320.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein

321.  Defendant Riley, by denying Plaintiff access to the African and African-American Studies Office and confiscating his mailbox and official mail located therein immediately after Plaintiff filed a complaint with MCAD; and Defendants Thomas III, Grossman, and Griffith, by their deliberate indifference to Plaintiff's complaints on this matter and by endorsing this misconduct, unlawfully retaliated against Plaintiff—and thereby violated his constitutionally protected right, guaranteed by the First Amendment Petition Clause and enforced by 42 U.S.C. § 1983, to petition the government for redress of his grievances.

### Count 36: First Amendment Retaliation
### Against Defendants Santos and Farrington

322.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

323.    Defendant Santos, by denying Plaintiff the 2012 salary increase immediately after Plaintiff filed a complaint with MCAD; and Defendant Farrington, by knowing of and endorsing this deprivation, unlawfully retaliated against Plaintiff—and thereby violated his constitutionally protected right, guaranteed by the First Amendment Petition Clause and enforced by 42 U.S.C. § 1983, to petition the government for redress of his grievances.

### Count 37: First Amendment Retaliation
### Against Defendants Fowler, Grossman, Santos, Riley, Griffith, and Thomas III

324.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

325. Defendant Fowler, by the severe materially adverse employment actions, sanctions, pains, and exactions he imposed on Plaintiff immediately after he knew that Plaintiff had named him as an individual respondent in the MCAD complaint; Defendants Grossman, Santos, Riley, and Griffith (had contemporaneous, personal knowledge of this unlawful retaliatory conduct), by their endorsement of Defendant Fowler's arbitrary and irrational conducts; and Defendants Grossman and Thomas III, by their deliberate indifference to Plaintiff's complaints concerning Defendant Fowler's harassing conduct and by adopting the harassment as an institutional policy against Plaintiff—unlawfully retaliated against Plaintiff and thereby violated his constitutionally protected right, guaranteed by the First Amendment Petition Clause and enforced by 42 U.S.C. § 1983, to petition the government for redress of his grievances.

### Count 38: First Amendment Retaliation
### Against Defendants Grossman, Griffith, Riley, and Santos

326. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

327. Defendant Grossman, by arbitrarily and irrationally placing Plaintiff on "paid administrative leave" immediately after she knew that Plaintiff had named her as an individual respondent in the MCAD complaint; Defendants Griffith, Riley, and Santos (who had contemporaneous, personal knowledge of this impermissible conduct) by endorsing Defendant Grossman's conduct—unlawfully retaliated against Plaintiff, and thereby violated his constitutionally protected right, guaranteed by the First Amendment Petition Clause and enforced by 42 U.S.C. § 1983, to petition the government for redress of his grievances.

### Count 39: First Amendment Retaliation

**Against Defendants Caret, Fowler, Grossman, Riley, Santos, and Thomas III**

328.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein

329.    Defendants Caret, Fowler, Grossman, Riley, Santos, and Thomas III, by the retaliatory actions they have taken since November 2013 to terminate Plaintiff's employment because Plaintiff filed this lawsuit on October 11, 2013, are in violation of Plaintiff's constitutionally protected right of access to courts for redress of wrongs, guaranteed by the First Amendment Petition Clause and enforced by 42 U.S.C. § 1983.

**Count 40: Obstruction Of Right To Make And Enforce Contracts**
**Against Defendants Hogan, Garro, MacCormack, Caret, Santos, Griffith, Santow, Farrington, Fowler, Riley, Grossman, and Thomas III**

330.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

331.    Defendants Hogan, Garro, Santos, Santow, Farrington, Fowler, Riley, Grossman, by irrationally obstructing Plaintiff's employment as Director of AAAS and by doing so for no justification and for no legitimate purpose; Defendants MacCormack, Caret, Grossman, Griffith, Santos, and Thomas III, by their deliberate indifference to Plaintiff's complaints about this  irrational conduct, and by their adoption of this unlawful discriminatory action as an institutional policy; and all named Defendants, by acting with discriminatory intent and discriminatory purpose against Plaintiff because of his race, violated his right, guaranteed by 42 U.S.C. § 1981 and enforced by 42 U.S.C. § 1983, to make and enforce contracts as is enjoyed by white citizens.

**Count 41: Deprivation Of Right To Substantive Contractual Equality**
**Against Defendants Hogan, Farrington, Fowler, Garro, Grossman, Riley, Santos, Santow, MacCormack, Caret, Griffith, and Thomas III**

332.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

333.     Defendant Hogan deceitfully contrived and perpetuated the false narrative of Plaintiff's noncompliance with the collective bargaining agreement and his responsibilities as a tenured faculty. Defendants Farrington, Fowler, Garro, Grossman, Riley, Santos, and Santow have used this deceitfully contrived false narrative as the pretextual basis for depriving Plaintiff of his constitutionally protected right to substantive contractual equality, with devastating consequences on the terms and conditions of Plaintiff's employment.

334.     Defendants MacCormack, Caret, Santos, Griffith, Grossman and Thomas III have not only remained deliberately indifferent to Plaintiff's complaints about this irrational conduct, they adopted Defendant's Hogan false narrative, embellished by Defendants Farrington and Fowler, as an institutional policy.

335.     All named Defendants, by acting with discriminatory intent and discriminatory purpose against Plaintiff because of his race, violated his right, guaranteed by 42 U.S.C. § 1981 and enforced by 42 U.S.C. § 1983, to make and enforce contracts as is enjoyed by white citizens.

**Count 42: Reprisal Discrimination**
**Against Defendants Garro, Hogan, Santow, Farrington, Santos, Riley, Fowler, Grossman, MacCormack, Caret, Griffith, Majewski, and Thomas III**

336.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

337.     Plaintiff has been insistent that Defendants have an obligation to implement the remedial measures they submitted to EEOC, in a sworn Position Statement, to remediate the intentional discriminatory evaluations which he was subjected to by Cheng, Koot, Mitchell, Travers, and Williams. Plaintiff has also been opposed to Defendants' obdurate refusal to implement those remedial measures.

338.     Because of Plaintiff's many complaints, all Defendants know of Plaintiff's insistence on the implementation of the remedial measures, and his opposition to the continuing obdurate refusal by Defendants to do so.

339.     Defendants Garro, Hogan, Santow, Farrington, Santos, Riley, Fowler, and Grossman have responded by intentionally subjecting Plaintiff to systemic, brutal, unlawful reprisal discrimination manifested in the unconstitutionally discriminatory, exceptionally severe materially adverse employment actions and punishments, pains, penalties and exactions catalogued herein.

340.     This reprisal discrimination has hindered Plaintiff from enjoying the benefits, privileges, terms, and conditions of his contractual relationship with UMassDartmouth, and thereby deprived Plaintiff of his protected right to substantive contractual equality.

341.     Defendants Garro, Hogan, Santow, Farrington, Santos, Riley, Fowler, and Grossman, by their impermissible and irrational conducts; Defendants MacCormack, Caret, Griffith, Majewski, Grossman, and Thomas III, by their deliberate indifference to Plaintiff's complaints, and by adopting the reprisal discrimination as an institutional policy; and all these Defendants, by acting with discriminatory intent and discriminatory purpose against Plaintiff because of his race, violated his right guaranteed by 42 U.S.C. §

1981 and enforced by 42 U.S.C. § 1983 to make and enforce employment contracts as is enjoyed by white citizens.

### Count 43: Racially Hostile Work Environment
**Against Defendants Caret, Farrington, Fowler, Garro, Grossman, Griffith, Hogan, MacCormack, Majewski, Riley, Santos, Santow, and Thomas III**

342.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

343.     Defendants Caret, Farrington, Fowler, Garro, Grossman, Hogan, Riley, Santos, and Santow have intentionally engaged in an irrational policy of subjecting Plaintiff to a racially hostile work environment that has been severe, systemic, pervasive, persistent, threatening, humiliating, objectively offensive.

344.     This racially hostile work environment has obstructed Plaintiff's right to participate in and enjoy the benefits, privileges, terms, and conditions of his contractual relationship with UMassDartmouth.

345.     Defendants Caret, Farrington, Fowler, Garro, Grossman, Hogan, Riley, Santos, and Santow, by their irrational and impermissible policy; Defendants MacCormack, Caret, Griffith, Majewski, Grossman, and Thomas III, by their deliberate indifference to Plaintiff's complaints, and by adopting a racially hostile work environment for Plaintiff as an institutional policy; and all these Defendants, by acting against Plaintiff with discriminatory intent and discriminatory purpose because of his race, violated his right guaranteed by 42 U.S.C. § 1981 and enforced by 42 U.S.C. § 1983 to make and enforce employment contracts as is enjoyed by white citizens.

### Count 44: Denial Of Full And Equal Benefit Of Laws
**Against Defendants Caret, Farrington, Fowler, Garro, Griffith, Grossman, Hogan, MacCormack, Majewski, Riley, Santos, Santow, and Thomas III**

346. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

347. Plaintiff hereby restates and incorporates by reference paragraphs 1 through 663 as though fully set forth herein against Defendants named under this Cause of Action.

348. UMassDartmouth collective bargaining agreement governs personnel decisions, and guarantees Plaintiff clearly defined due process procedures before he can be suspended from teaching, guarantees that Plaintiff's salary will continue to be paid except if his employment is terminated (and therefore that Plaintiff cannot be placed on "unpaid administrative leave"), and protects Plaintiff's employment from unjust termination.

349. Defendants Caret, Farrington, Fowler, Garro, Grossman, Hogan, Riley, Santos, and Santow, by subjecting Plaintiff to employment actions as well as punishments, pains, penalties and exactions that are not in conformity with the collective bargaining agreement; Defendants MacCormack, Caret, Majewski, Santos, Griffith, Grossman, and Thomas III, by their deliberate indifference to Plaintiff's complaints concerning these violations and by adopting the deprivation of Plaintiff's right to full and equal benefit of laws as an institutional policy; and all these Defendants, by acting with discriminatory intent and discriminatory purpose against Plaintiff because of his race, violated his right guaranteed by 42 U.S.C. § 1981 and enforced by 42 U.S.C. § 1983 to make and enforce employment contracts as is enjoyed by white citizens.

## Count 45: Violation of Like Punishment Clause
### Against Defendants Garro, Hogan, MacCormack, Caret, and Santos

350. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein

351.    Defendants Garro and Hogan intentionally engaged in a pattern and practice of imposing severe employment sanctions on Plaintiff based on false allegations of his noncompliance with the collective bargaining agreement.

352.    The record shows that Defendants Garro and Hogan routinely **_violated specific_** clauses of the same collective bargaining agreement in their actions against Plaintiff. Yet, these Defendants, both Caucasians, exempted themselves—and were exempted by Defendants MacCormack, Caret, and Santos—from any sanction for actually violating specific clauses of the collective bargaining agreement.

353.    By thus acting with discriminatory intent and discriminatory purpose against Plaintiff because of his race, all these Defendants violated Plaintiff's federally protected rights under the Like Punishment Clause guaranteed by 42 U.S.C. § 1981 and enforced by 42 U.S.C. § 1983.

## Count 46: Violation of Like Punishment Clause
### Against Defendants Farrington, Fowler, Grossman, Santos, and Thomas III

354.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

355.    Defendants Farrington, Fowler, Grossman, and Santos intentionally engaged in a pattern and practice of imposing severe employment sanctions on Plaintiff based on false allegations of his noncompliance with the collective bargaining agreement.

356.    The record shows that Defendants Farrington, Fowler, Grossman, and Santos routinely **_violated specific_** clauses of the same collective bargaining agreement in their actions against Plaintiff. Yet, these Defendants, who do not belong to Plaintiff's protected class, exempted themselves—and were exempted—from any sanction for actually violating specific clauses of the collective bargaining agreement.

357.     By thus acting with discriminatory intent and discriminatory purpose against Plaintiff because of his race, all these Defendants violated Plaintiff's federally protected rights under the Like Punishment Clause guaranteed by 42 U.S.C. § 1981 and enforced by 42 U.S.C. § 1983.

### Count 47: Discriminatory Constructive Discharge
**Against Defendants Caret, Farrington, Fowler, Garro, Griffith, Grossman, Hogan, MacCormack, Majewski, Riley, Santos, Santow, and Thomas III**

358.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

359.     Defendants Farrington, Fowler, Garro, Grossman, Hogan, MacCormack, Riley, Santos, and Santow have subjected Plaintiff to working conditions so intolerable that any reasonable employee subjected to the same conditions would have resigned.

360.     Plaintiff has complained about these intolerably working conditions to Defendants MacCormack, Caret, Santos, Griffith, Majewski, Grossman and Thomas III. Plaintiff also complained that his efforts to find another job were being sabotaged by Defendant Hogan who provided employer references/employment verification to Plaintiff's potential employers. These Defendants not only showed deliberate indifference to Plaintiff's complaints, they made it an institutional policy to constructively discharge him.

361.     By intentionally subjecting Plaintiff to discriminatory constructive discharge because of his race, the named Defendants violated Plaintiff's right to substantive contractual equality guaranteed by 42 U.S.C. § 1981 and enforced by 42 U.S.C. § 1983.

### Count 48: Conspiracy To Obstruct Justice
**Against Defendants Caret, Fowler, Grossman, Riley, Santos, and Thomas III**

362. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

363. Defendants Caret, Fowler, Grossman, Riley, Santos, and Thomas III, by the actions they have taken since November 2013 to terminate Plaintiff's employment because he filed this lawsuit on October 11, 2013, are in violation of the protections guaranteed to Plaintiff by 42 U.S.C. § 1985(2) and enforced by 42 U.S.C. § 1983.

### Count 49: Conspiracy To Deprive Constitutional Rights
**Against Defendants Caret, Farrington, Fowler, Garro, Griffith, Grossman, Hogan, MacCormack, Majewski, Riley, Santos, Santow, and Thomas III**

364. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

365. The facts catalogued above show that Defendants Hogan, Garro, Santow, Farrington, Santos, Riley, Fowler, and Grossman have acted not only individually, but in conspiracy with one another, for the intentional and unlawful purpose of depriving Plaintiff of his rights guaranteed by the federal constitution and laws because of his national origin and race; and that as a consequence, Plaintiff has been subjected to systemic, pervasive, persistent, and willful deprivation of those rights.

366. Because of Plaintiff's complaints, Defendants MacCormack, Grossman, Majewski, Griffith, Caret, and Thomas III are aware of this discriminatory conspiracy and its discriminatory purposes. These Defendants have not only remained deliberately indifferent to Plaintiff's complaints, they acquiesced in the said unlawful conspiracy and its unlawful purposes, and also adopted the unconstitutional actions taken against Plaintiff as an institutional policy. By these actions, these Defendants encouraged both

the conspiracy and its unconstitutional conducts with reckless disregard for Plaintiff's constitutionally protected rights.

367.    By reason of their conspiratorial interlocking and reinforcing actions, the named Defendants violated the protections guaranteed to Plaintiff by 42 U.S.C. § 1985(3) and enforced by 42 U.S.C. § 1983.

## Count 50: Failure To Prevent Conspiracy
**Against Defendants Caret, Farrington, Fowler, Garro, Griffith, Grossman, Hogan, MacCormack, Majewski, Riley, Santos, Santow, and Thomas III**

368.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

369.    All Defendants, acting severally or in groups or jointly, have a constitutional duty to intervene to prevent violations and deprivations of Plaintiff's federally protected rights. Because of their refusal to do so, Plaintiff has suffered and continues to suffer systemic, pervasive, persistent, and willful deprivation of his federally protected rights. As a consequence, each Defendant violated the protections guaranteed to Plaintiff by 42 U.S.C. § 1986 and enforced by 42 U.S.C. § 1983.

## Count 51: M.G.L. c. 12 § 11I Claim
**Against Defendants**
**Caret, Farrington, Fowler, Garro, Grossman, Hogan, Riley, Santos, and Santow**

370.    Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein.

371.    Defendants Caret, Farrington, Fowler, Garro, Grossman, Hogan, Riley, Santos, and Santow have repeatedly interfered and repeatedly attempted to interfere by threats, intimidation or coercion with Plaintiff's exercise and enjoyment of rights secured by the

Constitutions and laws of the United States and Massachusetts, and thereby violated the protections guaranteed to Plaintiff by M.G.L. c. 12 § 11I.

### Count 52: Civil Conspiracy
**Against Defendants Caret, Farrington, Fowler, Garro, Griffith, Grossman, Hogan, MacCormack, Majewski, Riley, Santos, Santow, and Thomas III**

372.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint as if set forth fully herein 713.

Defendants Hogan, Garro, Santow, Farrington, Santos, Riley, Fowler, Grossman, MacCormack, Majewski, Griffith, Caret, and Thomas III have acted in concert and joined together in an unlawful manner, pursuant to a common design to harass, threaten, intimidate, and injure Plaintiff. Each Defendant knew of the conduct of the others and the common tortuous scheme. Each Defendant assisted and/or encouraged the other Defendants, with the knowledge that this assistance and encouragement contributed to the common plot to deprive Plaintiff of his federally protected rights.

373.     By contributing to this conspiratorial plot, each Defendant engaged in civil conspiracy, entitling Plaintiff to damages in an amount to be proven at trial.


## VIII.   PRAYER FOR RELIEF

As a direct and proximate result of Defendants' wanton and callous constitutional transgressions as set forth above:

(A)     Plaintiff has suffered and continues to suffer loss of his clearly established constitutional rights, including his protected property interest in continued and continuous employment; his right to be free in the enjoyment of his faculties, earn a livelihood, establish a home, bring up his children, and enjoy the privileges recognized as essential to the orderly pursuit of happiness; and equal opportunity in public employment.

(B)     Plaintiff has suffered and continues to suffer incalculable damage to his professional career, loss of professional and personal reputation, substantial injury to his family and family life, dislocation of his social (including extended family) and professional networks, deprivation of his salary and benefits,  artificially suppressed earning capacity (through denial of promotion, salary increases, and annual merit pay increases), and loss of more rewarding employment opportunities leading to loss of professional advancement as well as past and future income, and low standards of living

(C)     Plaintiff has unnecessarily been exposed to the more dangerous conditions of diabetes-induced ailments, starvation, financial ruin, destitution, and homelessness.

(D)     Plaintiff has suffered and continues to suffer emotional distress, mental anguish, humiliation, physical injury, pain and suffering.

WHEREFORE, Plaintiff prays that, after due proceedings, judgment be entered in his favor and against all Defendants, jointly and severally, and that this Court grant the following:

**Equitable Reliefs**

1.      issue a Declaratory Judgment that Defendants violated Plaintiff's clearly established constitutional rights,

2.      enjoin and restrain all Defendants and those working in concert with them from further depriving Plaintiff of his constitutional rights; and from acting and conspiring to intimidate, deter and harass Plaintiff from exercising those rights,

3.      enjoin and restrain any person or group of persons, acting in any capacity, from considering, discussing, or taking any decision on the constitutionally flawed "recommendation of the Dartmouth campus" to terminate Plaintiff's employment,

4.      reverse any and all adverse employment actions taken against Plaintiff since October 11, 2013, when this lawsuit was filed, by Defendants or any person(s) acting on their behalf or in concert with them,

5.      enjoin and restrain all Defendants—because of their callous and reckless disregard of Plaintiff's clearly established constitutional rights, and their consistent, conscious disregard of the foreseeable risk of inflicting maximum harm, including death, on Plaintiff—from any further direct or indirect participation in any decision concerning Plaintiff's constitutionally protected rights, except as ordered by the Court,

6.      enjoin and order Defendant Grossman, in her official capacity, to expunge all and any documentation related to the unconstitutional conducts catalogued herein from all University files and records (including but not limited to Plaintiff's personnel files) however stored,

7.      enjoin and restrain all Defendants and those working in concert with them from making any reference to any of the documents related to the unconstitutional conducts catalogued herein and the underlying unconstitutional conduct(s) in any interaction with others, except for the purpose of admitting that the document(s) was/were irrational and malicious, and that the underlying conduct(s) was/were unconstitutional,

8.      enjoin and order Defendants Grossman and Thomas III, acting in their official capacities and under the supervision of the Court, to institute policies, practices, and procedures that will deter the culture of lawlessness which permitted the unconstitutional conducts catalogued herein, including prompt and unbiased investigation of employee complaints and an institutional respect for the constitutional rights of all employees and students,

9.      enjoin and order Defendant Thomas III, acting in his official capacity and under the supervision of the Court, to institute policies that will ensure that a recommendation for termination is for just cause and not a spiteful effort to "get" the faculty for reasons unrelated to any legitimate objective, and that such a recommendation is preceded by meaningful on-campus pre-deprivation hearings,

10.     enjoin and order Defendant Thomas III, acting in his official capacity and under the supervision of the Court, to institute policies that will ensure System-wide compliance with the University of Massachusetts Affirmative Action Policy, and the Board's resolutions in support of pluralism and its policy against intolerance,

**Make Whole Reliefs Part I**

11.     enjoin and order Defendants Grossman and Thomas III, in their official capacities, to make Plaintiff whole by placing him in the following positions he would have been if Defendants had not willfully and maliciously subjected him to systemic and reckless deprivation of his constitutionally protected rights:

12.     retroactive reinstatement of his salary from January 7, 2013,

13.     releasing to Plaintiff all his official mail, including his professional journals, that have been confiscated since September 2012,

14.     award Plaintiff the sabbatical leave he has earned,

15.     conversion of all the travel grants that Plaintiff could not apply for and obtain since 2007 because of the unconstitutional conducts catalogued herein into a block research grant for Plaintiff,

16.     replacement of the lost research grant from the Kennedy Library Foundation,

17.     award Plaintiff a one-year paid leave so that he can (a) go to libraries, which he has not done since summer 2007, because of the unconstitutional conducts catalogued herein, in order to catch up with developments in his professional field and (b) catch up with new technology/media relevant to his professional work;

18.     promotion of Plaintiff to Full Professor retroactively to 2008, when Plaintiff would have ordinarily earned promotion,

19.     upward revisions of Plaintiff's base salary to reflect his actual compensation levels as determined by the job market retroactive to 2008: this will compensate Plaintiff for employment opportunities he has lost since 2008 because of Defendants' unconstitutional actions against him,

20.     award Plaintiff salary increases and annual merit pay increases unlawfully denied him as part of Defendants' unconstitutional actions against him,

21.     because (a) of the long history of hostility (going back to 2007) against Plaintiff, (b) this hostility has become an institutional policy, from the entire spectrum of the Dartmouth campus to the President and the Board of Trustees, (c) this hostility deepens by the day and with each new administrator, and (c) Plaintiff's isolation and ostracism on the Dartmouth campus, Plaintiff considers it prudent to forgo reinstatement—and instead, seek front pay until he attains age 70 adjusted on the plus side by adding his sabbatical, his accumulated sick leave, and the one-year paid leave mentioned above;

**Make Whole Reliefs Part II**

22.     enjoin and order Defendants Fowler, Grossman, and Santos to reimburse Plaintiff, by their personal checks, for out-of-pocket expenses he incurred—payments to GIC for February-March 2013 benefits, penalties and federal/state taxes on the early IRA

withdrawals they forced on Plaintiff, compensation for stock market losses because of the said imposed early IRA withdrawals—because they callously and unjustly confiscated his salary in cruel and inhumane violation of University policy and without due process of law

23.     enjoin and order Defendants Fowler, Grossman, and Santos to pay Plaintiff, by their personal checks, a monthly interest as set by law on each paycheck they have confiscated from Plaintiff since January 2013—from the date each check should have normally been paid to the date Plaintiff receives his retroactively reinstated salary,[19]

24.     enjoin and order Defendants Fowler, Grossman, and Santos to pay Plaintiff, by their personal checks, for the adverse tax consequences arising from the lump sum payment of Plaintiff's unlawfully confiscated salary since January 2013

25.     enjoin and order Defendant Hogan to pay to Plaintiff, by his personal check, a monthly interest as set by law and the resulting tax, on each of Plaintiff's paycheck based on the 2011 salary increase—from the time each particular pay check was due to when back payment resulting from the salary increase is made to Plaintiff,

26.     enjoin and order Defendant Santos to pay to Plaintiff, by her personal check, a monthly interest as set by law and the  resulting tax, on each of Plaintiff's paycheck based on the 2012 salary increase—from the time each particular paycheck was due to when back payment resulting from the salary increase is made to Plaintiff,

27.     enjoin and order all Defendants sued in their individual capacities to pay prejudgment interest to Plaintiff on lump sum back payments arising from Make Whole Relief Part I, and to pay for the adverse or negative  tax consequences of such lump sum back payments;

---

[19] By law, each confiscated paycheck constitutes a separate constitutional misconduct.

**Compensatory And Punitive Damages**

28.     award Plaintiff all reasonable compensatory money damages against Defendants liable for each particular Count for:

(a)     depriving Plaintiff of/violating his constitutional rights, and for the concrete and particularized injuries-in-fact he has suffered and is suffering and is reasonably likely to suffer in future because of the deprivation/violation of his clearly established constitutional rights,

(b)     the diminished professional standing Plaintiff has suffered and is suffering and is reasonably likely to suffer in future because of the deprivation/violation of his clearly established constitutional rights,

(c)     the loss of enjoyment of life Plaintiff has suffered and is suffering because of the deprivation/violation of his clearly established constitutional rights,

29.     award Plaintiff damages against all Defendants because of the physical injury, pain and suffering, emotional distress, mental anguish, and humiliation Plaintiff has suffered, is suffering and is reasonably likely to suffer in future because of their deprivation/violation of his clearly established constitutional rights,

30.     award Plaintiff punitive damages against all Defendants because of their systemic, pervasive, persistent callous disregard of and reckless indifference to Plaintiff's clearly established constitutional rights,

31.     award Plaintiff compensatory money damages against Defendants liable under MGL c. 12 § 11I, and against all Defendants for violating state civil conspiracy law,

32.     award Plaintiff prejudgment (and if applicable, post-judgment) interest at such rate as the Court deems proper for claims under federal law and state laws,

**Attorneys' Fees, Costs, And Additional Relief**

33.     award Plaintiff reasonable attorneys' fees and expenses (a) pursuant to the Civil

Rights Attorney's Fees Awards Act of 1976, 42 U.S.C § 1988(b) for the prosecution of

his 42 U.S.C. § 1983 claims, and (b) for the prosecution of his state claims,

34.     award Plaintiff the costs of litigation, and award him such other and further relief

to which he may show himself justly entitled.


## IX.     DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by

jury on triable issues.


Respectfully submitted this 14th day of March, 2013.


/s/ Eric Nwaubani
Eric Nwaubani (Admitted pro hac vice.)
Plaintiff's Counsel
(DC #: 1011827; New York Bar #: 4421152)
1629 K Street, NW #300
Washington DC 20006
Tel: (202) 446-8050
ennwaubani@yahoo.com


## CERTIFICATE OF SERVICE

I, Eric Nwaubani, hereby certify that the above document was transmitted through the
CM/ECF electronic filing system of the United States District Court, to Denise Barton,
Esq.

/s/ Eric Nwaubani
Eric Nwaubani