UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
CHIDIEBERE NWAUBANI,          )
                              )
              Plaintiff,      )
                              )
         v.                   )          CIVIL ACTION
                              )          NO. 13-12552-WGY
DIVINA GROSSMAN, IN HER OFFICIAL )
CAPACITY AS CHANCELLOR OF THE )
UNIVERSITY OF MASSACHUSETTS   )
DARTMOUTH AND IN HER INDIVIDUAL )
CAPACITY; HENRY THOMAS        )
III, IN HIS OFFICIAL CAPACITY AS )
CHAIRMAN OF THE UNIVERSITY OF )
MASSACHUSETTS BOARD OF TRUSTEES AND)
IN HIS INDIVIDUAL CAPACITY; AND )
ROBERT CARET, JOHN FARRINGTON, )
ALEX FOWLER, ANTHONY GARRO, JAMES )
GRIFFITH, WILLIAM HOGAN, JEAN )
MACCORMACK, DEBORAH MAJEWSKI, )
JEANNETTE RILEY, CAROL SANTOS, AND )
MARK SANTOW, EACH IN HIS OR HER )
INDIVIDUAL CAPACITIES,        )
                              )
              Defendants.     )
_____)
```

YOUNG, D.J.                                   July 26, 2016

**FINDINGS OF FACT, RULINGS OF LAW,
AND ORDER FOR JUDGMENT**

## I.    INTRODUCTION

At bottom, this is a dispute between a tenured professor
and a university over the professor's teaching responsibilities.
While plaintiff Chidiebere Nwaubani ("Nwaubani") might have a
genuine grievance with his former employer, he does not have a
meritorious federal civil rights claim.  Nwaubani was hired by

the University of Massachusetts Dartmouth (the "University") in 2005 as (1) a tenured professor in the University's History Department and (2) the Director of its African and African-American Studies Program ("AAAS" or the "Program").  Ex. 4, UM000133.  On September 1, 2011, the Board of Trustees of the University, along with Divina Grossman ("Grossman"), Chancellor of the University, notified Nwaubani that he was being removed from his position as the Director of AAAS.  Ex. 50, UM007067-UM007068.

Nwaubani filed a complaint against Grossman and others[1] (collectively, the "Defendants") on October 11, 2013, Compl., ECF No. 1, followed by an amended complaint[2] against the same Defendants on January 29, 2014, seeking injunctive and monetary relief, Second Am. Compl., ECF No. 23.  On June 24, 2014, Nwaubani was notified that his University employment had been terminated.  Concise Statement Material Facts Supp. Univ. Defs.' Mot. Summ. J. ("Statement") ¶ 61, ECF No. 92; Pl.'s Resp. Defs.'

---

[1] In addition to Grossman, Nwaubani's complaint was filed against Anthony Garro, Jeannette Riley, Robert Caret, James Griffith, Jean MacCormack, Carol Santos, William Hogan, John Farrington, Mark Santow, Deborah Majewski, and Alex Fowler.  See Compl., ECF No. 1.

[2] Nwaubani filed an amended complaint, see Am. Compl., ECF No. 9, in addition to the second amended complaint described above.  His attempt to file a third amended complaint was denied by the Court.  See Elec. Order, ECF No. 82.

Statement Undisputed Material Facts Supp. Mot. Summ. J. ("Resp.") ¶ 61, ECF No. 95.

At a motion hearing held on November 13, 2015, the Court dismissed all of Nwaubani's claims except for Count 1 and Counts 33-39.  Elec. Clerk's Notes, ECF No. 112.  The remaining claims are a procedural due process claim, brought under 42 U.S.C. § 1983, contesting Nwaubani's termination, and seven First Amendment retaliation claims based on the Defendants' response to Nwaubani's complaints about workplace discrimination allegedly due to his race and national origin.  Second Am. Compl. ¶¶ 228-229, 313-329.

At the final pre-trial conference on December 17, 2015, counsel agreed to address these remaining claims on a case-stated record.  Elec. Clerk's Notes, ECF No. 121.[3]  Following the case-stated hearing, which was held on January 28, 2016, see Elec. Clerk's Notes, ECF No. 126, and upon a full review of the entire record, the Court makes the following findings of fact and rulings of law.

---

[3] A case-stated hearing is a procedure that allows the Court to make a judgment based on an undisputed record.  In its review of the record, the Court is entitled to "'engage in a certain amount of fact-finding, including the drawing of inferences.'" TLT Constr. Corp. v. RI, Inc., 484 F.3d 130, 135 n.6 (1st Cir. 2007) (quoting United Paperworkers Int'l Union Local 14 v. Int'l Paper Co., 64 F.3d 28, 31 (1st Cir. 1995)).

## II.   FINDINGS OF FACT

The Court first discusses Nwaubani's positions within the University, before delving into his pre-2011 track record of performance.  It then describes his being removed from his position as Director of AAAS and the suspension of his teaching duties, before detailing the complaint he filed before the Massachusetts Commission Against Discrimination ("MCAD"), and his subsequent administrative leave and termination.

### A.   Nwaubani's Positions and Obligations

Nwaubani was hired as a tenured professor in the University's History Department in 2005.  Ex. 4, UM000133; Statement ¶ 1; Resp. 2-3.  Nwaubani was also hired as Director of AAAS.  Ex. 4, UM000133; Statement ¶ 1; Resp. ¶ 1.  The offer letter Nwaubani received and signed states:

> It is my pleasure to offer you appointment to the faculty of the University of Massachusetts Dartmouth [as] a tenured Associate Professor in the Department of History, College of Arts & Sciences, and Director of the African and African American studies program.

Ex. 4, UM000133 (emphasis added).  The letter also specified that Nwaubani was to carry out

> duties of a full-time member of the faculty as agreed upon by the chairperson of your department, the dean of your college, the provisions in the attached Terms of Employment, the attached Evaluation Standards for Tenure and Promotion, and the Provisions of the Faculty Federation Agreement. These duties include teaching, advising graduate and undergraduate students . . . and serving the university and the community.

Id. at UM000133-UM000134; Statement ¶ 3.  Nwaubani argues that, while the offer letter gives the impression that his primary responsibility was with the History Department, in fact, according to him, he was mainly hired as Director of AAAS. Resp. ¶¶ 1, 3.  The Defendants counter that it is clear throughout Nwaubani's hiring documents that he was hired both as an Associate Professor in the History Department and as Director of the AAAS.[4]  Statement ¶ 6.  This disagreement is the main source of the ensuing conflict between Nwaubani and the University, with the former prioritizing his role in the AAAS Program over his participation in the History Department, and the latter requesting that Nwaubani commit to all his obligations as an Associate Professor in the History Department.

## B.   Nwaubani's Employment with the University Prior to 2011

Not long after he was hired, the relationship between Nwaubani and the University began to sour.  In late 2007 to early 2008, back-and-forth communication between Nwaubani and the History Department Chair evinced disagreement about Nwaubani's 2006-2007 faculty evaluation covering his roles as Director of AAAS and Associate Professor in the History

---

[4] The Defendants point to an internal May 25, 2005, Memorandum that states that "[i]n addition to his faculty position, Dr. Nwaubani will also serve as the Director of the [AAAS]."  Statement ¶ 6.

Department.  Exs. 11-13.  In a subsequent letter to the History Department Chair, Nwaubani argued that the University did not fully appreciate his work as Director of AAAS developing a program still in its infancy, and that his obligations to AAAS, in addition to other scholarly duties, prevented him from participating in "every and all History Department activities." Ex. 13, UM002453-UM002454.

The next year's annual faculty evaluation was also critical of Nwaubani's performance in the History Department, in particular as a result of student dissatisfaction with Nwaubani's teaching, ascribing him a rating of "not recommended[.]" Ex. 39, UM002538.  The evaluation, however, recognized that Nwaubani had increased student enrollment in the AAAS courses and "galvanized student interest" in the Program. Id. at UM002539.  In response to the unfavorable evaluation, on May 27, 2008 Nwaubani sent an email to multiple recipients titled "History Department Faculty Evaluation: I HAVE WITHDRAWN" in which he requested not to be evaluated anymore and accused the History Department of "lynching."  Ex. 24, UM002531.

In late 2008, Nwaubani complained to the University's Office of Equal Opportunity, Diversity, and Outreach about his faculty evaluation and the evaluation process and later submitted a formal complaint against the University with the Equal Employment Opportunity Commission ("EEOC") on May 21,

2009, alleging discrimination on the basis of race in the rating given in his faculty evaluation.  Exs. 29-36; Mem. Supp. Mot. Dismiss Second Am. Compl. ("Def.'s Mem. Dismiss"), Ex. 3, Ex. E-3, EEOC Charge Discrimination, ECF No. 34-3.  In its August 7, 2009 response to the allegations (which it denied), the University asserted that the position of Director of AAAS is "not a permanent or tenured position."  Def.'s Mem. Dismiss, Ex. 3, Ex. E-4, University Massachusetts, Darmouth's Resp.  In the same response, the University proposed that since "the bulk" of Nwaubani's work at the University involved his role as Director of AAAS, the committee handling future faculty evaluations for Nwaubani be comprised of AAAS-affiliated faculty, independent of the History Department's evaluation process, and that the committee submit the evaluation directly to the Dean of the College of Arts and Sciences.  Id. at 7-8.  The EEOC eventually issued a "Dismissal and Notice of Rights" on October 28, 2009. Def.'s Mem. Dismiss, Ex. 3, Ex. E-1, EEOC Dismissal Notice Rights.[5]

The Dean of the Faculty of Arts & Sciences, William Hogan ("Hogan"), reiterated the University's proposal of changing the

---

[5] Nwaubani had also filed a complaint with the MCAD on October 28, 2009, and, similarly, the MCAD issued a "Lack of Probable Cause Finding" on December 15, 2010, see Def.'s Mem. Dismiss, Ex. E-2, MCAD Notice Final Disposition.  This was a separate action from Nwaubani's 2012 MCAD Complaint, discussed infra.

process for Nwaubani's faculty evaluation in a May 28, 2009 email to Nwaubani, in which Hogan stated that he was "willing to attempt to shepherd [Nwaubani's evaluation] through the [AAAS] Committee."  Ex. 34, UM002895; <u>see also</u> University Defs.' Summ. J. Mot., Ex. 5 at UM003183-UM003184, ECF No. 91-5.  Nwaubani interprets Hogan's email as also instructing him to stop teaching History Department courses.  Resp. ¶ 72.  The Court finds that there is no such instruction.

Throughout 2010, Nwaubani continued to argue he should be promoted to a full Professorship, and to dispute the University's account of his performance and its interpretation of the scope of his appointment in the History Department, with which Nwaubani no longer wished to be affiliated.  <u>See</u> Exs. 42-47.

C.  **Nwaubani's Removal from the Director Position and Suspension from his Teaching Duties**

On September 1, 2011, the University removed Nwaubani from his position as Director of AAAS.  This was accomplished in a letter written by Hogan: it summarily stated that Nwaubani "ha[d] not provided the leadership and administrative oversight that are expected from the Director [of AAAS]."  Ex. 50, UM007067-UM007068.  With respect to Nwaubani's tenured position in the History Department, Hogan peppered the letter with instances in which Nwaubani had failed to comply with the

provisions of the Faculty Federation's (the "Union's")
bargaining agreement[6] (the "CBA") and requested that Nwaubani
"become a fully functioning member of the History Department."
Id.  Nwaubani was urged to address the issues raised in the
letter, which included his unreported absences from the classes
he was teaching, in order to avoid a formal disciplinary process
that could lead to termination for cause.  Id.

On September 6, 2011, Nwaubani sent an email to forty-four
people and the American Association of University Professors,
headed: "THE UNITED STATES GIVES 'TO BIGOTRY NO SANCTION, TO
PERSECUTION, NO ASSISTANCE'(George Washington)," claiming that
every adverse action taken by the University since he had filed
his 2009 EEOC complaint, including his removal as Director of
the AAAS, was retaliatory.  Ex. 51, UM006956.

A day later, Nwaubani emailed Hogan to express his
frustration about, among other things, being assigned a schedule
of teaching back-to-back classes when "everyone" knew that he
had an "ADA-specified disability," workplace stress-induced
pain, which made this impossible.  Ex. 56, UM006907.  The same
day, an "Equal Opportunity Officer" followed up with Nwaubani,

---

[6] Both parties agree that the University's obligations and
procedures concerning the terms and conditions of employment for
all faculty members are set forth in the CBA, Ex. 1, which is
the collective bargaining agreement between Nwaubani's union and
the University.  Statement ¶ 97; Resp. ¶ 97.

inquiring whether he was requesting an ADA accommodation concerning the interval between the classes he was assigned to teach.  Ex. 56, UM006906.  A week later, Hogan informed Nwaubani that students were complaining that Nwaubani had not attended the classes he was supposed to teach and suggested a different class schedule.  Ex. 57, UM006738.  University officials continued to inquire with Nwaubani, via email, about his health and his ability to meet his teaching requirements, to no response.  Exs. 58-59.

On October 17, 2011, Hogan notified then-History Department Chair Mark Santow ("Santow") that, as Nwaubani was no longer the AAAS Director, Nwaubani was contractually bound to teach three (instead of two) courses in the Spring 2012 semester, and asked that a third course be assigned using the History Department's customary procedure.  Ex. 60, UM007069.  Hogan also informed Nwaubani in an official letter that Nwaubani's failure to submit his Faculty Activities Report for 2010-2011 put him "in non-compliance with the terms of the [CBA,]" and that, therefore, he was "not eligible for a salary rate increase" and, if his non-compliance continued, could be subject to "further disciplinary action including, but not limited to, suspension from class under the provisions of Article III.B of the [CBA]."  Ex. 61, UM007066.

On October 19, 2011, Santow asked Nwaubani to inform him, by October 31, 2011, which Spring 2012 history course Nwaubani would like to teach and to advise him of Nwaubani's preferred time slot.  Ex. 62.  The same day, Nwaubani filed a formal complaint with the University's Office alleging capricious annual faculty evaluations and retaliation by Hogan,[7] Ex. 64, UM007250-UM007261; shortly after, the Office of Human Resources began conducting its review of the matter.  Ex. 63, UM000192. On November 4, 2011, Hogan informed Nwaubani that Nwaubani had been assigned to teach a third course in the Spring 2012 semester.  Ex. 64.

On January 31, 2012, Nwaubani sent another email to Hogan and others in which he informed the recipients that he had filed a civil rights complaint against the University with the United States Department of Education.  Ex. 65, UMJ007246.  He claimed that since his hiring, he had been subjected to a "Jim Crow-type hostile environment" by the History Department.  Id.  In particular, he complained that Hogan "commanded" him to teach a

---

[7] In that complaint, Nwaubani stated that following his 2009 EEOC complaint, the University had "effected remedial measures that effectively separated [him] from the . . . Department[,] [such as]: Hogan asking [him] to stop teaching courses for the Department [and] . . . inform[ing] [him] that [his annual faculty] evaluations would be handled by an AAAS committee, independent of the . . . Department."  Ex. 65, UM007251.

"World Civilizations II" course in Spring 2012, which he deemed to be an "UNLAWFUL WORK ASSIGNMENT[.]"  Id.

Responding to Nwaubani's January 31, 2012 email, the Office of Human Resources emailed him on February 1, 2012, and sent him a letter on February 9, 2012, noting that it had been attempting to contact him since Fall 2011 in response to these same concerns but that Nwaubani had not responded.  Exs. 66-67. Nwaubani then demanded that the Defendants "cease and desist" from sending him mail.  See Ex. 67 (containing handwritten return-to-sender message).

In another email sent on May 22, 2012, Nwaubani "updated" his January 31, 2012 email, adding that not only had Hogan made him teach "World Civilisations II" in the Spring 2012 semester, but, without directly consulting Nwaubani, Hogan had assigned him to teach two sections of another world civilizations course in Fall 2012.  Ex. 68, UM007379.  Nwaubani wrote that he had to refuse Hogan's "LATEST UNLAWFUL WORK ASSIGNMENT[.]"  Id. at UM007381.  The battle lines were now drawn.

On May 31, 2012, in an internal memorandum, the University indicated that because Nwaubani did not submit the contractually mandated paperwork, it was unable to perform his 2011-2012 annual faculty evaluation.  Ex. 69, UM007523.

On June 26, 2012, University Provost John Farrington ("Farrington") sent a letter to Nwaubani inviting him to discuss

[12]

his concerns with his appointment and related professorial responsibilities and his notification concerning sabbatical eligibility.  Ex. 70.  In his email response on September 4, 2012, Nwaubani wrote Farrington that he had recently noticed that he had been excluded from teaching any classes in Fall 2012, and asserted that he lacked "information [as to] why [he] was excluded from teaching," as well as to the identity of the decision-maker, when the decision was made, and what the decision's implications were.  Ex. 71, UM007590.

On September 4, 2012, Farrington responded to Nwaubani that he based the decision to remove Nwaubani from teaching on Nwaubani's failure to comply with the CBA, and invited Nwaubani to discuss what "series of steps" could be taken to restore his "teaching status."  Id. at UM007589.  Farrington also informed Nwaubani that should Nwaubani decline to meet with him within two weeks, it would "likely . . . result in [Nwaubani's] being placed on unpaid leave until . . . [Nwaubani] fulfill[s] or agree[s] in a signed document in writing to fulfill [his job] responsibilities."  Id.  In a further letter, Farrington requested that the meeting be scheduled by September 12, 2012.  Ex. 72.

   D.   **Nwaubani's MCAD Complaint**

On September 12, 2012, Nwaubani filed a second complaint with the MCAD[8] against the University and other University officials in which he listed the cause of discrimination as retaliation, later amended to also include discrimination based on race and national origin.  Def.'s Mem. Dismiss, Ex. 2, Ex. D-1, MCAD Complaint, ECF No. 34-2.  The MCAD had not issued any determination concerning Nwaubani's pending charges as of the time of the case-stated hearing.  Statement ¶ 71; Resp. ¶ 71.

### E.   Nwaubani's January 2013 Administrative Leave

On January 3, 2013, in response to Nwaubani's failure to respond to the September 4, 2012 request for a meeting, the Interim Provost[9] notified Nwaubani that as of January 7, 2013, he would be placed on unpaid administrative leave until such time as the University "either return[ed him] to active faculty duties or terminat[ed his] service."  Ex. 75, UM000206.  In that letter, the Interim Provost expressly set forth the steps Nwaubani needed to take to return to active University service[10] and advised Nwaubani that his failure to take those steps within

---

[8] For an explanation of his first MCAD complaint, see supra note 5.

[9] Farrington no longer was Provost.

[10] These steps included Nwaubani's acknowledging professional responsibilities to the History Department and his submitting to a "periodic multi-year review (PMYR) of [his] performance."  Ex. 75, UM 000206.

30 days, including meeting to discuss his situation, would be considered "abandon[ment] [of his] faculty position" and would cause the University to "terminate [his] employment."  Id.

Nwaubani did not meet with the University within the specified time frame, and the Interim Provost notified him on February 12, 2013 that, as a result, the Interim Provost was recommending to Chancellor Grossman that Nwaubani's employment be terminated for cause.[11]  Ex. 76.

Nwaubani filed a grievance with his Union on February 13, 2013, concerning his placement on unpaid administrative leave. See Ex. 79, UM 008204.  On March 29, 2013, the Union's Grievance Committee found that the parties' contract -- the CBA -- gave the University authority to place Nwaubani on administrative leave, but also found that the contract required the leave to be with pay.  Id. at UM008204-UM008205.  The Grievance Committee therefore recommended that Nwaubani's "pay and benefits be retroactively restored. . . . [and] should continue unless and until he is terminated by the [University] President and a vote of the Board of Trustees."  Id. at UM008206.

Grossman followed the Committee's recommendation, moving Nwaubani from unpaid administrative leave to paid administrative

---

[11] Nwaubani asserts that he never received a copy of this recommendation.  See Resp. ¶ 42.

leave and ordering that his compensation and other conditions of employment be restored, retroactive to January 7, 2013.[12]  Ex. 80.  The University then began the process of retroactively re-instituting the employer-paid portions of Nwaubani's insurance premium payments and began the process of paying him his retroactive compensation.  Exs. 82-85.

On July 25, 2013, however, Nwaubani expressly directed the Defendants not to deliver his paychecks to him.  Ex. 86; Resp. ¶ 47.  Even so, in Nwaubani's filings he repeatedly asserts that the Defendants "confiscated" his salary from January 7, 2013 forward; his descriptions included statements that the "confiscation" was "inhumane and unjustifiable."  Statement ¶ 48, Resp. ¶ 48.[13]  The case-stated record demonstrates that, until his termination, Nwaubani was tendered his appropriate compensation and benefits.

F.   **Nwaubani's Termination**

---

[12] Nwaubani states that at this time, Grossman was aware that Nwaubani had filed a hostile work environment complaint against her, as one of the University officials, with the MCAD because she had been mailed the requisite paperwork on June 29, 2013.  Pl.'s Am. Mot. Prelim. Inj., Ex. 1, Pl.'s Aff. ¶ 16, ECF No. 27-1.

[13] There is nothing to this so-called "confiscation" claim, even though factual disputes are alleged.  On September 2, 2014, the defendants sent Nwaubani the money that he had repeatedly rejected and, on September 16, 2014, he cashed the check.  Ex. 86, SA0376-SA0423; see Pl.'s Am. Mot. Prelim. Inj., Ex. 1, Pl.'s Aff. ¶¶ 25, 31, ECF No. 27-1.

On June 21, 2013, Grossman notified Nwaubani that she intended to recommend his termination to the University's President.  Ex. 88.  Grossman indicated that before submitting her recommendation she would afford Nwaubani a two-week period to convince her otherwise.  Id.  Nwaubani never contacted her, Statement ¶ 52, and thus Grossman recommended to the University's President that Nwaubani be terminated, stating that he had "failed to honor his obligations as a faculty member as outlined in the Provost's memo."  Ex. 89.

On October 11, 2013, Nwaubani filed this lawsuit.  Compl. The University initially notified Nwaubani of its process to "terminate [his] employment for cause[,]" but, on November 13, 2013, apparently re-considered, writing to his attorney that Nwaubani "will continue as an employee of [the University] until further notice."  Ex. 90.  On February 24, 2014, the University's President shifted course again, now sending a letter to Nwaubani that described the contours of the pre-termination process: Nwaubani would be entitled "to be represented by counsel or a representative of [his] choice, to speak on [his] own behalf, to present evidence and witnesses, and to cross-examine witnesses presented by the University." Ex. 93.  The University's President further informed Nwaubani that he must respond by March 3, 2014, if he wanted a hearing.

Id.  He did not respond,[14] so the University proceeded with the process "based on the record that [wa]s before [it.]"  Ex. A.

On June 16, 2014 at 8:08 a.m., the University notified Nwaubani via email of the time and place of the June 18, 2014 Board of Trustees meeting at which the recommendation for his termination would be considered.  Ex. B.  This email informed Nwaubani that he was entitled "[t]o be present during the deliberations; [t]o have counsel of his choosing present, . . . [t]o speak [on his] own behalf; [and] [t]o . . . an independent record [of the proceedings,] at [his] expense."[15]  Id.  Nwaubani claims that neither he nor his counsel saw the June 16, 2014 message until late on June 19, 2014.  Resp. ¶¶ 57-60.

Nwaubani did not appear at the June 18, 2014 Board of Trustees meeting.  Statement ¶ 60.  At that meeting, the Board of Trustees voted to concur with the University's President regarding Nwaubani's termination.  Ex. C.  On June 24, 2014, the

---

[14] In a belated email sent on March 17, 2014, Nwaubani refused to participate in the process, calling it a "flawed exercise" and a "manifestation of a predetermined effort to terminate [his] employment" that the Defendants were "barred from conducting," because of Nwaubani's pending litigation against the University in this Court.  Ex. 94.

[15] The Defendants allege that said email address to which Nwaubani's counsel's June 16, 2014 notice was sent is the same email address he provided to the Court for purposes of the CM/ECF system and that Nwaubani used the email address through July 14, 2014 (or thereabout).  Statement ¶ 58.

Defendants provided written notification to Nwaubani that his
University employment had been terminated.  Ex. D.

## III. RULINGS OF LAW

At present, Nwaubani has eight outstanding counts against
the Defendants, Count 1 and Counts 33-39 in his second amended
complaint.  Elec. Clerk's Notes, ECF No. 112.  Count 1 alleges a
procedural due process violation under 42 U.S.C. § 1983,
primarily contesting Nwaubani's "ousting" from his directorship.
Second Am. Compl. ¶¶ 228-229.  Counts 33-39 allege unlawful
retaliation based on First Amendment activity -- specifically
retaliation in response to Nwaubani's complaints about workplace
discrimination allegedly due to his race and national origin --
and are also brought under 42 U.S.C. § 1983.  See id. ¶¶ 313-329.
The Court first discusses the issues of immunity involved,
before analyzing Nwaubani's procedural due process claim and his
claim of retaliation, in turn.

### A.   Immunity from Suit

As a threshold matter, the University is subject to suit
neither for monetary damages nor injunctive relief under 42
U.S.C. § 1983, and its employees are not subject to suit for
monetary damages in their official capacities.  See, e.g.,
Johnson v. Rodriguez, 943 F.2d 104, 108 (1st Cir. 1991) ("It is
settled beyond peradventure . . . that neither a state agency
nor a state official acting in his official capacity may be sued

[19]

for damages in a section 1983 action.") (internal citations
omitted); O'Neill v. Baker, 210 F.3d 41, 47 (1st Cir. 2000)
(internal citation omitted) (noting that suits by citizens for
injunctive relief against state agencies in federal court are
prohibited by the Eleventh Amendment).  As state officers,
however, the University employees can be sued in their official
capacities for injunctive relief under 42 U.S.C. § 1983, e.g.,
Pearson v. Callahan, 555 U.S. 223, 242 (2009) (internal citation
omitted), and Nwaubani is, in addition to requesting monetary
damages, seeking injunctive relief, see Second Am. Compl. at 78-
79; Pl.'s Opp'n Defs.' Mot. Summ. J. 10, ECF No. 96.

The individual defendants acting in their personal capacity
can be liable, but are protected, in a limited way, by qualified
immunity.  See, e.g., Newman v. Commonwealth of Massachusetts,
884 F.2d 19, 23 (1st Cir. 1989) (applying qualified immunity to
state university officials).  Since the Court rules that
Nwaubani has not demonstrated a constitutional violation, no
analysis of whether any of his purported rights were "clearly
established," as would be required before liability could be
imposed on the individuals, id., is necessary.  See, e.g.,
Lopera v. Town Of Coventry, 640 F.3d 388, 396 (1st Cir. 2011)
(internal citations omitted) (stating that courts can proceed in
a qualified immunity case by first analyzing whether there was a
constitutional violation).

B.   **Due Process Claim**

To succeed on his procedural due process claim, Nwaubani must establish that he has a "protected property interest recognized under state law[.]" Caesars Massachusetts Mgmt. Co. v. Crosby, 778 F.3d 327, 331-32 (1st Cir. 2015) (internal citation omitted).  Next, he must show that a "person," 42 U.S.C. § 1983, "acting under color of state law, deprived [him] of that property interest without constitutionally adequate process." Marrero-Gutierrez v. Molina, 491 F.3d 1, 8 (1st Cir. 2007) (internal citation omitted).

Nwaubani's second amended complaint only alleges a "protected property interest" in his directorship, see Second Am. Compl. ¶¶ 228-229, but because the termination of his professorship was discussed at oral argument, the Court, in its discretion, will also consider it as a potential source of a "protected property interest."

1.   **Directorship**

The parties dispute whether Nwaubani had a protected property interest in the directorship or whether this position was nothing more than employment at will.  Compare Pl.'s Further Br. 11, ECF No. 124; with Def.'s Resp. Pl.'s Jan. 18 Br. ("Def's Resp. Jan. 18") 7, ECF No. 125.  In particular, the Defendants argue that Nwaubani's directorship position was but an administrative, discretionary service position that paid a

stipend of $1,500.  Def.'s Resp. Jan. 18 4-5; Ex. 1, CBA, Art. XI(A)(8).

For due process purposes, "[a] person's interest in a benefit is a 'property' interest if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit that he may invoke at a hearing." Perry v. Sindermann, 408 U.S. 593, 601 (1972) (internal citation omitted).  Specifically, "[f]or an [employment] interest in a statutorily created benefit to become a protected property interest under the Fourteenth Amendment, a person must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Coyne v. City of Somerville, 972 F.2d 440, 443 (1st Cir. 1992) (internal citations and quotation marks omitted).  "Massachusetts law assumes at-will employment, unless there exists, expressly or impliedly, a contract governing the terms and conditions of employment."  O'Rourke v. Hampshire Council of Governments, 121 F.Supp.3d 264, 270 (D. Mass. 2015) (Mastroianni, J.) (internal citation omitted); see also Santos v. City of Fall River, 942 F.Supp.2d 178, 188 (D. Mass. 2013) (Gorton, J.) ("An at-will employment contract, without more, does not create a reasonable expectation of continued employment.").

Nwaubani claims that there was an implied employment contract to overcome the at-will starting point.  In support of

this argument, he points out that there was national search to recruit for the directorship, he received a stipend for his service in this role, he performed various administrative duties in the AAAS program, and he reported to the Dean of the College of Arts and Sciences.  Pl.'s Further Br. 15.  Nwaubani further states that he had a legitimate expectation that this position was protected because it was the University's practice that Program Directors and chairpersons held those positions for "considerable lengths of time."  Id. at 16.  He identifies caselaw from the Second Circuit that ostensibly supports his position.  See id. at 12 (citing Malla v. Univ. of Connecticut, 312 F.Supp.2d 305 (D. Conn. 2004)).

While not bound by it, the Court nonetheless discusses persuasive Second Circuit precedent.  The most relevant of the line of cases on which Nwaubani would have this Court rely begins with Ezekwo v. New York City Health & Hosps. Corp., 940 F.2d 775 (2d Cir. 1991).  There, the Second Circuit ruled that, despite being in neither an "individual written contract" nor a CBA, a plaintiff had an implied contractual property interest in the "Chief Residency" of the hospital at which she worked.  Id. at 782.  The court explained:

> [The hospital] adopted a policy and practice of
> awarding the position of Chief Resident to all third
> year residents on a rotating basis.  This method of
> selection was not haphazardly applied; it was an
> established practice which was expressly highlighted

in HHC's informational documents.  While we can find
no evidence in the record concerning how long this
method of selection was utilized, it is plain that the
practice predated [the plaintiff's] admittance to the
program and continued while she was there.  [The
plaintiff's] expectation of obtaining the position was
further enhanced when she was verbally advised in June
1987 that she would be Chief Resident from November
1987 until February 1988.  Thus, [the plaintiff]
consistently had been informed that she would rotate
through the position of Chief Resident and receive a
salary differential as a result of that designation.
We think that this course of conduct, coupled with
Ezekwo's reasonable reliance thereon, created a
contractual right that rose to the level of a
significant property interest that would be protected
under state law.

Id. at 783 (emphasis supplied).

There are at least two material differences between Ezekwo
and the instant one.  First, in Ezekwo, the practice at issue
was explicitly stated, in two ways.  It was "highlighted in . .
. informational documents" given to those accepted into the
medical residency program.[16]  Ezekwo was also verbally informed

---

[16] Such documents included

[a] brochure, . . . [which] described the [residency]
program and stated that each . . . resident would
serve as 'Chief Resident' for four months during his
or her third year.  The position of Chief Resident
carried with it administrative and organizational
responsibilities. . . . In addition, the resident who
assumed the position received an increased salary and
the designation of Chief Resident was of some future
professional value.  [The hospital's] practice was to
rotate third year residents through the position of
Chief Resident.  The sequence of rotation was based on
alphabetical order in one year and then, in the
following year, reverse alphabetical order.
Appointment to the position of Chief Resident was

that she would be Chief Resident, and was told when her tenure
would begin, and how long it would last.  See id. at 778.  Here,
Nwaubani claims that the fact of there being an advertisement
for the directorship cuts in favor of finding a property
interest, see Pl.'s Further Br. 15, but there is no suggestion
that this advertisement indicated to him, for example, that he
would be entitled to the directorship for a specified amount of
time, or that he would only be fired for cause.

Second, Ezekwo reasonably relied on the hospital's
representations.  See Ezekwo, 940 F.2d at 783.  Nwaubani
suggests that he too relied on the University's representations,
see Pl.'s Further Br. 16 (discussing the higher ranking of his
prior university employer), but this purported reliance is at
such a high level of generality -- "the promise that he would
provide leadership for the transformation of AAAS into an
academic department[,]"  id. at 16 -- that it fails to create "a
legitimate claim of entitlement to [the position]."  Coyne v.
City of Somerville, 972 F.2d 440, 443 (1st Cir. 1992) (holding

---

      never based on academic merit or any formal evaluative
      process.

Ezekwo, 940 F.2d at 777.

that "no reasonable interpretation" of a "general directive"
would create a property interest).[17]

Fundamentally, then, the difference between the instant
case and Ezekwo's is that there, all of the circumstantial facts
supporting an implied contract were regarding Ezekwo's
entitlement to the position; the circumstances told her: when
you are a third-year resident, automatically you will be
promoted to a temporary position as Chief Resident, which you
will hold for a pre-specified amount of time, and for which you
will receive extra compensation.  Here, in contrast, the
circumstances told Nwaubani, at most, that since "[p]rogram
[d]irectors and [d]epartment chairpersons [hold] those positions
for considerable lengths of time[,]" Pl.'s Further Br. 16, he
likely would too.  This says nothing about his entitlement to
the directorship.[18]

_____

[17] Malla, 312 F.Supp.2d at 321-323, to which Nwaubani
analogizes his case, applies the holding of Ezekwo v. New York
City Health & Hosps. Corp., 940 F.2d 775 (2d Cir. 1991), to
another set of facts.  The Malla court held there to be a
protectable property interest despite no contractual provision
to that effect, based on a custom of the university-defendant in
"which the grant writer is entitled to the lead role if the
grant is awarded."  Id. at 322.  This link is more direct than
in the instant case, and thus fails to save Nwaubani's claim.

[18] In other words, Ezekwo need not be expanded any further
than its factual circumstances, at least in this Circuit.  See
Galvin v. Town of Yarmouth, 470 F.Supp.2d 10, 15 n.9 (D. Mass.
2007) (distinguishing Ezekwo and noting its unique circumstances
where "the hospital had not only adopted and followed a policy
and practice of awarding the position of Chief Resident to all

That Nwaubani was hired both as a professor in the History
Department and as the director of the AAAS Program, see Ex. 4,
UM000133, fails to establish that the due process protections
provided for in the CBA for faculty apply to directorships, as
well.  This is especially so where, as the University points
out, the CBA explicitly mentions the director position in a
manner that suggests it is far from a professorship: "[t]he
Provost shall annually publish a list of full-time faculty
members . . . who serve as Directors or Coordinators.  Effective
September 1, 2009, each individual on this list shall receive an
annual stipend of $1,500.  Failure to receive the stipend shall
not be grievable."  Ex. 1, CBA, Art. XI(A)(8) (emphasis
supplied).

Nwaubani fails to point to a provision of the CBA that
supports his claim, and the University correctly points out that
the CBA explicitly reserves all power to the Board of Trustees
and the administration.  See id. Art. XX (stating that
"[n]othing in this [CBA] shall derogate from or impair any
power, right or duty heretofore possessed by the Board of
Trustees or by the administration except where such right, power

---

third year residents on a rotating basis, but [where the
plaintiff] had been explicitly promised the job by her
supervisors.") (Stearns, J.).

or duty is specifically limited by this [CBA.]").[19]  This, too,
supports the University's current position -- which it has
articulated in the past, albeit in the context of litigation --
that the directorship was at will.  <u>See</u> Def.'s Mem. Dismiss, Ex.
3, Ex. E-4, University Massachusetts, Darmouth's Resp.
(responding to the EEOC complaint, the University asserts that
the directorship is "not a permanent or tenured position").
Nwaubani's belief that the University altered the default at-
will status of the directorship was not based on "a state
statute, rules or [his employment] contract[.]"  <u>O'Rourke</u>, 121
F.Supp.3d at 270 (citation omitted); <u>Marrero-Gutierrez</u>, 491 F.3d
at 8 (stating that "[t]o establish a constitutionally protected
property interest in employment, a plaintiff must demonstrate
that she has a legally-recognized expectation that she will
retain her position").[20]

---

[19] In this reserving-powers tack, the drafters of the CBA
followed a similar course to the writers of the Tenth Amendment.
<u>See</u> U.S. Const. amend X (stating all powers "not delegated to
the United States by the Constitution, nor prohibited by it to
the States, are reserved to the States respectively, or to the
people."). Just as the Tenth Amendment ensures the leftover
power goes to the States or the people, the CBA reserves such
power to the University's administrators.

[20] The Court is also unpersuaded by Nwaubani's argument that
<u>Collins</u> v. <u>Univ. of New Hampshire</u>, 664 F.3d 8 (1st Cir. 2011)
supports the contention that he had a property right to the
Director of AAAS position. Pl.'s Further Br. 14-15. In that
case, Collins was a tenured associate professor as well as the
chair of a department and was removed from his chair position.
<u>Collins</u>, 664 F.3d at 10, 12. The First Circuit ruled that

Because the directorship is not a protected property right, constitutionally speaking, Nwaubani was not entitled to any process prior to its termination.  See, e.g., Caesars Massachusetts Mgmt. Co., 778 F.3d at 331-32 (internal citation omitted).  Consequently, the Defendants did not violate any of Nwaubani's procedural due process rights when they ended his directorship.

### 2.   Professorship

The parties agree that Nwaubani's professorship is a due-process-triggering property right but they disagree as to whether due process was provided.

"[D]ue process requires a pre-termination hearing when a person having a property interest in his employment is terminated."  Fontana v. Comm'r of Metro. Dist. Comm'n, 34 Mass. App. Ct. 63, 69 (1993); see also Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985).  In order to afford Nwaubani due process, the hearing must involve "oral or written

---

Collins's removal did not result in a violation of due process. Id. at 18-19.  Nwaubani argues that "[i]t is of significance that neither the district court nor the Appeals Court questioned Collins['s] protected property interest in his position as department chair: this question was not even raised before the courts."  Pl.'s Further Br. 15.  That the court in Collins chose to reject Collins's claim by focusing on the propriety of the process afforded to him, see Collins, 664 F.3d at 18-19, supplies no indication as to there being a protected property interest, and thus fails to support Nwaubani's case.

notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." Cotnoir v. Univ. of Maine Sys., 35 F.3d 6, 11 (1st Cir. 1994) (citation omitted).

The University President's February 2014 letter apprising Nwaubani of his rights, see Ex. 93, described a hearing process that comports with due process, and Nwaubani's refusal to engage in that process, see Exs. A, 94, precludes a successful procedural due process claim. See, e.g., Mercado-Alicea v. P.R. Tourism Co., 396 F.3d 46, 53 (1st Cir. 2005) ("[D]efendants did not violate [plaintiff's] due process rights when his inability to present his side of the story was due to his failure to participate.").[21]

**C. Retaliation**

Nwaubani alleges that after he filed claims with the United States Department of Education in 2012 (Counts 33 and 34), the MCAD in 2012 (Count 35-38), and this Court in 2013 (Count 39),

---

[21] Whether Nwaubani received the email notification of the June 18, 2014 Board of Trustees meeting, see Ex. B, is beside the point. This notice was sent to an email address belonging to Nwaubani. Resp. ¶ 58; see Ex. 94 (Nwaubani had sent his prior refusal to participate in the hearing process from the same email address). At that point in time, Nwaubani had already been provided with the constitutionally required notice and opportunity to be heard, and had explicitly refused to participate in the University's process. Even had he not, the Court finds Nwaubani's assertion that he had not read the notice before the hearing occurred implausible.

the Defendants retaliated against him by terminating him. Second Am. Compl. ¶¶ 313-329.

When evaluating a First Amendment retaliation claim, the Court proceeds in multiple stages.  See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977) (describing burden-shifting framework); Guilloty Perez v. Pierluisi, 339 F.3d 43, 56 (1st Cir. 2003) (internal citations omitted).  First, "a party must show that her conduct was constitutionally protected, and that this conduct was a substantial factor or a motivating factor driving the allegedly retaliatory decision."  Gorelik v. Costin, 605 F.3d 118, 123 (1st Cir. 2010) (internal citations omitted).  If the plaintiff succeeds at this first step, "[t]he defendant may then avoid a finding of liability by showing that 'it would have reached the same decision . . . even in the absence of the protected conduct.'"  Powell v. Alexander, 391 F.3d 1, 17 (1st Cir. 2004) (quoting Mt. Healthy, 429 U.S. at 287); see also D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 43 (1st Cir. 2012). Here, as will be explained below, Nwaubani fails at the first step, and, even had he not, the Defendants have shown that they would have taken the same action regardless of Nwaubani's protected conduct.

The Defendants agree that, by filing the above-named claims, Nwaubani engaged in protected conduct, and that Nwaubani

suffered adverse action in form of his June 2014 termination. Def.'s Resp. Jan. 18 at 10.  They argue, however, that his claims fail because he has not produced evidence of causation. Id. at 10.  They are correct.

Nwaubani has not identified any independent facts that support his allegation that his protected speech substantially motivated the Defendants to punish him,[22] thus his claim fails. See Guilloty Perez, 339 F.3d at 56 ("[T]he plaintiff who must prove that the protected conduct was a motivating factor in the adverse employment action must produce some facts linking that action to his conduct.") (internal citation omitted).  The purported facts on which Nwaubani would rely as proof of causation are illusory.  For example, concerning Nwaubani's allegation that his annual performance was not evaluated after 2008 as retaliation for his protected activity, he neglects to mention that on May 31, 2012, the Defendants told him that because he had not submitted the contractually-mandated paperwork, they were unable to perform his annual evaluation. Ex. 69.  Similarly, there is no evidence of a retaliatory motivation in the confiscation of Nwaubani's salary (or of any confiscation at all, see supra note 13 and accompanying text).

---

[22] Nwaubani claims a multitude of other retaliatory indignities in addition to those discussed above.  Pl.'s Further Br. 19.  They also fail because of a lack of proof of causation.

Thus, Nwaubani has failed to prove that his protected conduct was a motivating factor for the actions taken by the Defendants.

Further, even had Nwaubani demonstrated such a motivating factor, this Court concludes that the Defendants would have reached the same decision in the absence of the protected conduct.  See DB ex rel. Elizabeth B., 675 F.3d at 43 (internal citation omitted).  Nwaubani ultimately was terminated in June 2014, having launched his various complaints in 2012 and 2013. Ex. C.  Yet, several years before the 2012 and 2013 protected conduct, the Defendants had begun warning Nwaubani that his conduct might result in such consequences as suspension or termination.  Exs. 26-27, 41, 44-46, 61, 64.  It may be true that there is a temporal proximity between Nwaubani informing the Defendants about the MCAD complaint on September 12, 2012, Am. Compl. ¶ 161, and the Defendants denying Nwaubani a salary increase on October 24, 2012, Am. Compl. ¶ 168, as well as placing him on unpaid administrative leave.  Ex. 75, UM000206. Those actions, however, were merely part of a process that was announced to Nwaubani as early as 2008.[23]  The Defendants'

_____

[23] For example, in 2009, the University's Office wrote in its report addressing and rejecting Nwaubani's 2008 allegations of discrimination that "the evidence established that the defendants were critical of Complainant largely due to their frustration concerning [Nwaubani's] handling of his obligations as a member of the History Department."  Memo Re: University Defs.' Summ. J. Mot., Ex. 5, Summary of Finding UM003003-UM003004, ECF. 91-5.

evidence regarding Nwaubani's non-compliance with various
directives, and with his duties to the History Department,
coupled with their negative employment actions prior to his
protected conduct, is sufficient for them to prevail.  Cf.,
e.g., Furtado v. Standard Parking Corp., 820 F.Supp.2d 261, 280
(D. Mass. 2011) ("This timeline eviscerates the causation
element because [defendants] had already taken an adverse
employment action . . . against [plaintiff] before [plaintiff
engaged in protected activity].")  Thus, these actions are not
retaliation.

IV.   **CONCLUSION**

    For the foregoing reasons, judgment shall enter in favor of
the Defendants.


**SO ORDERED.**


                                    /s/ William G. Young
                                    WILLIAM G. YOUNG
                                    DISTRICT JUDGE